ORIGINAL



**FILED IN CLERK'S OFFICE**

JUL 2 ... 0

**LUTHER** D. ...

By: ...

~~Deputy Clerk~~

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TIG INSURANCE COMPANY, :
:
    Plaintiff, :
:
v. :             **CIVIL ACTION FILE**
:      **NO.** _____
UNIVERSAL WRESTLING CORP., :
INC. f/k/a WORLD CHAMPIONSHIP :   **1 03 CV 2096**
WRESTLING, INC., TURNER :
SPORTS, INC., TURNER :          **-HTW**
ENTERTAINMENT GROUP, INC, :
SIDNEY R. EUDY, and JOHNNY :
LAURINAITIS, :
:
    Defendants. :

## COMPLAINT FOR DECLARATORY JUDGMENT

COMES NOW plaintiff TIG Insurance Company ("TIG") and files

this Complaint for Declaratory Judgment showing the Court as

follows:

### PARTIES

1.

TIG, Plaintiff herein, is incorporated under the laws of

California with its principal place of business in Texas.

2.

Universal Wrestling Corporation, Inc. ("UWC"), a defendant

herein, was formerly known as World Championship Wrestling, Inc.

("WCW"). UWC is incorporated under the laws of Georgia with its

principal place of business in New York. UWC has designated ...

Corporation System, 1201 Peachtree Street, N.E., Atlanta, Georgia 30361, as its registered agent for service of process.

3.

Turner Sports, Inc., a defendant herein, is incorporated under the laws of Georgia with its principal place of business in New York. Turner Sports, Inc. has designated CT Corporation System, 1201 Peachtree Street, N.E., Atlanta, Georgia 30361, as its registered agent for service of process.

4.

Turner Entertainment Group, Inc., a defendant herein, is incorporated under the laws of Georgia with its principal place of business in New York. Turner Entertainment Group, Inc. has designated CT Corporation System, 1201 Peachtree Street, N.E., Atlanta, Georgia 30361, as its registered agent for service of process.

5.

Sidney R. Eudy, a defendant herein, is a resident of Arkansas and entered into a contract with WCW in the State of Georgia. Eudy has filed a lawsuit arising from that contract in the Superior Court of Fulton County, Georgia.

6.

Johnny Laurinaitis, a defendant herein, is a resident of Florida, and seeks coverage under a TIG policy delivered in

Georgia for Eudy's lawsuit presently pending in the Superior Court of Fulton County, Georgia.

## JURISDICTION AND VENUE

7.

There is complete diversity of citizenship between plaintiff and defendants.

8.

The amount in controversy exceeds $75,000.

9.

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 2201.

10.

Venue over this action is proper in this Court pursuant to 28 U.S.C. § 1391.

11.

Defendants are subject to the personal jurisdiction of this Court.

12.

There is an actual controversy with respect to an insurance contract delivered in Georgia for a lawsuit pending in Georgia such that this Court should declare the rights and legal obligations of the parties pursuant to 28 U.S.C. § 2201 and O.C.G.A. §§ 9-4-1 et seq.

## RELATIONSHIP BETWEEN EUDY AND WCW

13.

Eudy provided wrestling services pursuant to a written contract with WCW, a true and complete copy of which is attached hereto as Exhibit A ("Employment Agreement").

14.

Under the terms of Eudy's Employment Agreement, WCW arranged his performances and appearances, including his transportation to and from WCW-scheduled events, and had authority to approve his wardrobe, props, and make-up. WCW also owned all rights to Eudy's "name, image, likeness, character, costume, props, ring name, voice, logo, service marks, trademarks, trade names, signature, gimmicks, routines, themes, and charicatures [sic] and any and all other distinctive and identifying indicia as used by or associated with [Eudy.]"

15.

WCW advised Eudy on developing his wrestling style and prepared scripts for his wrestling matches that specified the maneuvers the wrestlers were to use and determined the final outcome of the matches.

16.

Eudy and WCW agreed that the terms of the Employment Agreement would be construed pursuant to Georgia law and that

- 4 -

any disputes would be resolved in the United States District Court for the Northern District of Georgia.

17.

Eudy and WCW further agreed Eudy was eligible for workers compensation benefits, and that Eudy would accept such benefits as "his sole and exclusive remedy . . . for all injuries sustained" during the term of the Employment Agreement.

18.

Under the terms of the Employment Agreement as construed by Georgia law, and his performance of services thereunder, Eudy was an employee of WCW.

**UNDERLYING LAWSUIT**

19.

On January 14, 2001, Eudy injured his left leg during a WCW wrestling match while performing a maneuver scripted by WCW. Because Eudy sustained his leg injury during the course of his employment by WCW, he received workers' compensation benefits for his leg injury from a TIG workers' compensation policy issued to WCW.

20.

Eudy nevertheless filed a lawsuit in the Superior Court of Fulton County against WCW, Turner Sports, Inc. and Turner Entertainment Group, Inc. seeking to recover under common law

- 5 -

theories for injuries he allegedly received on January 14, 2001.
A true and accurate copy of the initial complaint, bearing civil
action number 02CV48513, is attached hereto as Exhibit B.

21.

At the time of Eudy's injury, WCW was a division of Turner
Sports, Inc., which was a division of Turner Entertainment
Group, Inc.

22.

On information and belief, Eudy filed an amended complaint
on February 3, 2003.  The amended complaint was not tendered to
TIG for coverage.

23.

Eudy filed a second amended complaint on February 6, 2003,
which added more claims and included Johnny Laurinaitis, a/k/a
"Johnny Ace," as a defendant.  A true and complete copy of the
second amended complaint is attached hereto as Exhibit C.

24.

Laurinaitis was an employee of WCW at the time of Eudy's
injury.

## TIG'S COVERAGE DECISIONS

25.

WCW tendered the initial complaint to TIG for coverage,
pursuant to a commercial general liability policy issued for the

period April 1, 2000 to April 1, 2001, bearing policy number T7 0003796479902 ("CGL Policy").  A true and complete copy of the CGL Policy is attached hereto as Exhibit D.

26.

TIG reviewed Eudy's initial complaint and denied coverage under the CGL Policy because Eudy was not seeking damages covered by its terms.  A true and accurate copy of the denial of coverage letter is attached hereto as Exhibit E.

27.

Subsequent to its denial of coverage for the claims asserted in the initial complaint, Eudy's second amended complaint was tendered to TIG for coverage, by both WCW and Laurinaitis.  TIG reviewed the allegations of the second amended complaint, and agreed to defend pursuant to a reservation of rights agreement.  A true and complete copy of the reservation of rights letter is attached hereto as Exhibit F.

**PERTINENT POLICY PROVISIONS**

28.

Under Section I, Coverages of the Commercial General Liability Coverage Form ("CGL Form") of the Policy, TIG agreed to pay "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage to which this insurance applies. . . . However, [TIG] will have no

- 7 -

duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply."

29.

Under Section I (1)(b) of the CGL Form, "[t]his insurance applies to 'bodily injury' and 'property damage' only if (1) [t]he 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory;' and (2) [t]he 'bodily injury' or 'property damage' occurs during the policy period."

30.

Under the CGL Form's Commercial General Liability Broadened Coverage endorsement, "bodily injury" is defined as "bodily injury, sickness or disease sustained by a person. This includes mental anguish, mental injury, shock, fright, humiliation, emotional distress or death resulting from bodily injury, sickness or disease."

31.

Under Section V (13) of the CGL Form, "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

32.

Section I (2)(e)(1) of the CGL Form excludes coverage for "bodily injury" to "[a]n 'employee' of the insured arising out of and in the course of: (a) Employment by the insured; or (b) Performing duties related to the conduct of the insured's business."

33.

Under Section V (5) of the CGL Form, "'employee' includes a 'leased worker.' 'Employee' does not include a 'temporary worker.'"

34.

Under Section II(2)(a) of the CGL Form, "[WCW's]'employees', other than [WCW's] 'executive officers'" are insured, "but only for acts within the scope of their employment by [WCW] or while performing duties related to the conduct of [WCW's] business."

35.

Under Section II(2)(a)(1) of the CGL Form, "employees" are not insured for "bodily injury . . . to a co-'employee' while that co-'employee' is either in the course of his or her employment or performing duties related to the conduct of [WCW's] business."

36.

Under an "Employment-Related Practices Exclusion" endorsement to the CGL policy, the policy does not apply to "personal and advertising injury to: (1) A person arising out of any: (a) Refusal to employ that person; (b) Termination of that person's employment; or (c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, or discrimination directed at that person."

## RELIEF SOUGHT

37.

Based on all the terms, conditions and exclusions in the policy (whether expressly mentioned or identified in this complaint or not) as well as under relevant legal principles and public policy concerns, TIG seeks a declaration as to its obligation to defend and/or indemnify UWC, Turner Sports, Turner Entertainment Group, and Laurinaitis for the claims asserted in the Underlying Lawsuit.

38.

WHEREFORE, the plaintiff TIG Insurance Company prays that the Court:

(a)   Declare that TIG Insurance Company has no duty to defend or indemnify the claims made in the Underlying Lawsuit; and

(b)   Award such other and further relief as the Court shall deem just and proper.

Respectfully submitted

**FREEMAN MATHIS & GARY, LLP**

By:   _Philip W. Savin_
Philip W. Savrin
Georgia Bar No. 627836

_W. Mark Weaver_
W. Mark Weaver
Georgia Bar No. 743447
Attorneys for
TIG Insurance Company

100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339-5948
770/818-0000 (Telephone)
770/937-9960 (Facsimile)

JAS7019
3999.39763

~ 11 ~

# INDEPENDENT CONTRACTOR AGREEMENT

THIS INDEPENDENT CONTRACTOR AGREEMENT (the "Agreement") is made and entered into as of the 9th day of June, 1999 by and between **WORLD CHAMPIONSHIP WRESTLING, INC.**, a Georgia corporation located at One CNN Center, Atlanta, Georgia 30348 ("WCW"), and Sidney R. Eudy ("Wrestler").

FOR AND IN CONSIDERATION of the mutual promises and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.     **Services.**

(a)     Subject to the terms and conditions set forth in this Agreement, Wrestler agrees to provide the following services as requested by WCW (the "Services") (i) appear and perform as a professional wrestler at events, including without limitation, live and taped television shows, pay-per-view telecasts, live arena shows and other promotional events, as requested by WCW ("Events"); (ii) cooperate with and assist in activities intended to publicize, advertise and promote the Events, WCW and WCW merchandise, including, but not limited to, on-sale ticket appearances, media interviews and other publicity appearances; (iii) develop his own, individual wrestling style and persona, with advice from WCW, that will be attractive to wrestling fans; (iv) provide all wardrobe, props and make-up necessary for his performance at any Event; provided, however, all such items shall be subject to approval by WCW prior to their use in an Event; and (v) perform such other services as may be reasonably requested by WCW.  Wrestler agrees to use his best efforts to perform the Services in a professional manner consistent with the customs of the professional wrestling industry.

1



EXHIBIT
A

WCW 0489

(b)    In connection with Wrestler's performance of the Services,
Wrestler grants WCW the following exclusive, paid-up, worldwide rights: (i) to arrange
Wrestler's performance or appearance at Events; (ii) to sell or distribute admission tickets
for all Events; (iii) to create, publish, distribute, broadcast, photograph, film, tape or
otherwise record (or authorize others to do so), in any and all available media, any or all
of the Events or animated programs (any such creation or recording shall be referred to as
a "Program"); and (iv) to use, exhibit and distribute, and to license others to use, exhibit
and distribute, in perpetuity, any Program, or any part or segment of any Program, in any
and all media and by any and all methods, whether now known or coming into existence
hereafter, and, in connection therewith, to utilize and exploit the name, image, likeness,
character, costume, props, ring name, voice, logo, service marks, trademarks, trade
names, signature, gimmicks, routines, themes and charicatures and any and all other
distinctive and identifying indicia as used by or associated with Wrestler.  The rights
granted by this section shall be exclusive to WCW during the Term and for the period set
forth in section 9(b), and shall be non-exclusive thereafter. Wrestler expressly
acknowledges and agrees that the rights granted to WCW in section 1(b)(iv) shall
continue in effect after the expiration, nonrenewal or termination (for any reason) of this
Agreement.  WCW and Wrestler acknowledge and agree that they have entered into that
certain Merchandising Agreement of even date herewith with respect to certain specified
merchandising activities.

2.    **Independent Contractor.**  Wrestler, in the performance of the Services
agreed to in this document, is an independent contractor.  In the performance of this
Agreement, both WCW and Wrestler shall be acting in their own separate capacities and

2

WCW 0490

not as agents, employees, partners, joint venturers or associates of one another. It is expressly understood and agreed that Wrestler is not authorized to bind WCW to any liability or obligation or to represent that it has any such authority. Wrestler is responsible for all of his expenses, including without limitation, medical expenses, health and welfare insurance, disability insurance, training expenses, props, wardrobe, make-up and other expenses necessary to perform the Services under this Agreement. Without limiting the generality of the foregoing, Wrestler acknowledges that, as between WCW and Wrestler, Wrestler shall be solely responsible and liable for the payment of any and all withholding or other taxes levied, assessed or due as a result of the services which are performed by Wrestler under this Agreement. Any and all travel incurred by Wrestler in the performance of services hereunder shall be pursuant to WCW's Travel Policy, as amended by WCW from time to time.

3.   **Compensation.**

(a)   As full and complete compensation for the Services, WCW shall pay to Wrestler, and Wrestler shall accept, the payments described on Exhibit A, attached hereto and incorporated herein by reference.

(b)   Wrestler's compensation as outlined in Exhibit "A" shall be apportioned according to the following schedule:

| | |
|---|---|
| Pay Per Views | 40% of annual compensation |
| Televised Events (taped or live) | 25% of annual compensation |
| Non-Televised House Shows | 20% of annual compensation |
| Interviews, Photo Shoots and Personal Appearances | 15% of annual compensation |

3

WCW 0491

In the event Wrestler fails to timely appear and perform as required by WCW, except by reason of Incapacity, WCW shall have the right to deduct pro-rata sums from Wrestler's compensation payments based on the foregoing apportionment divided by WCW's reasonable projection of Wrestler's number of annual appearances in each category. In the event Wrestler is unable to perform due to Incapacity as defined below, the terms of section (8) shall apply. This right of WCW shall be in addition to every other remedy now or later existing at law or in equity and shall not in any way interfere with any rights on the part of WCW to enjoin Wrestler from any violation of this Agreement or any part thereof. Notwithstanding any reduction or deduction of compensation payments pursuant to this section, all remaining terms and conditions of this Agreement shall continue in full force and effect, unless and until terminated pursuant to the terms of this Agreement.

(c)     Notwithstanding the forgoing apportionment, for general payment purposes, Wrestler's compensation shall be payable in equal installments on a twice a month basis or based on such schedule as WCW may implement from time to time.

4.     **Ownership of Work Product.** All work product, themes, routines, characters, storylines, property, data, documentation or information or materials conceived, discovered, developed or created by Wrestler pursuant to this Agreement including, without limitation, the Programs (collectively, the "Work Product") shall be owned exclusively by WCW. To the greatest extent possible, any Work Product shall be deemed to be a "work made for hire" (as defined in the Copyright Act, 17 U.S.C.A. §§ 101 et seq., as amended) and owned exclusively by WCW. Wrestler hereby unconditionally and irrevocably transfers and assigns to WCW all right, title and interest

4

in or to any Work Product, including, without limitation, all patents, copyrights, trade secrets, trademarks, service marks and other intellectual property rights therein. Wrestler has previously developed, and represents to WCW that he is the sole owner of the following ring names[s], stage name[s] or nicknames[s] in connection with the provision of professional wrestling services: "Sid Vicious." Wrestler hereby licenses to WCW to use and exploit any and all of the Wrestler's Names exclusively during the Term for all purposes hereunder, and non-exclusively thereafter in connection with WCW's exploitation or use of the Programs. Wrestler agrees that any ring name, nickname, persona, logo or character developed by him and/or WCW during the Term and used by him in connection with performance of the Services shall be part of the "Work Product," and shall be the exclusive property of WCW. WCW shall have the right to register any such name, nickname or logo as a trademark or service mark of WCW, to the extent WCW considers such registration to be permitted and appropriate under any applicable law. Without regard to any such registration, Wrestler hereby covenants that he shall not use any such ring name, nickname, persona, logo or character developed during the Term for any purpose at any time, in perpetuity, without the express consent of WCW. Wrestler agrees to execute and deliver to WCW any transfers, assignments, documents or other instruments which WCW may deem necessary or appropriate, from time to time, to vest complete title and ownership of any Work Product, and all associated intellectual property and other rights, exclusively in WCW. If such Work Product is not considered to be a "work made for hire," Wrestler hereby assigns to WCW for One Dollar ($1.00) in hand and other good and valuable consideration all rights, title and interest in and to the copyright thereof and all renewals and extensions thereof that may be secured under the

5

WCW 0493

laws of any country now or hereafter in force and effect. WCW shall have full, immediate and unrestricted access to all Work Product during the Term of this Agreement.

5.     **Compliance with Laws, Rules and Regulations.** (a) Wrestler agrees to comply with all applicable policies, rules, procedures and regulations adopted from time to time by WCW (including without limitation the WCW Independent Contractor Rules and Regulations and Travel Policy) and all other applicable federal, state and local laws, rules, regulations, or ordinances; (b) Wrestler further agrees to abide by the terms and conditions of the WCW Substance Abuse Policy which Wrestler agrees he has received and reviewed.

6.     **Representations and Warranties.** Wrestler hereby represents and warrants to WCW as follows: (a) Wrestler has the full power, authority, ability and legal right to execute and deliver this Agreement and to perform his obligations hereunder including to utilize the name "Sid Vicious" in connection herewith; (b) Wrestler has all legal rights, power, authority and ability to convey the Work Product to WCW; (c) this Agreement constitutes the legal, valid and fully binding obligation of Wrestler and is enforceable in accordance with its terms; (d) the execution, delivery and performance of this Agreement have been consented to and authorized by all individuals or entities required to consent to and authorize the same, will not contravene any law, regulation, judgment or decree applicable to Wrestler, and will not cause or result in a breach of or default under any other agreement, contract or understanding to which Wrestler is a party; (e) there are no pending claims or litigation which would or might interfere with the performance of Wrestler's obligations or the enjoyment of WCW's rights under this

6

WCW 0494

Agreement; and (f) Wrestler is not currently using, and during the term of this Agreement, shall not use, any illegal drugs, steroids or other substances prohibited by WCW.

7.      **Indemnification**. Wrestler agrees to indemnify, defend and hold harmless WCW, its directors, officers, and shareholders, and their respective agents, officers and employees, against any and all suits, damages, expenses (including, without limitation, court costs, attorneys' fees and allocable costs of in-house counsel), losses, liabilities and claims of any kind, caused by or resulting from any breach of this Agreement or by any other act or omission of Wrestler whether the same may be the result of negligence, willful act, responsibility under strict liability standards, any other substandard conduct or otherwise.

Wrestler shall at all times be responsible for any loss or damage to any WCW property by Wrestler or while in the possession of Wrestler, unless said damage occurs at the direct instruction of WCW as part of a storyline. The loss or damage thereto shall be restored at Wrestler's expense.

8.      **Term, Termination and Incapacity**.

(a)      Unless sooner terminated in accordance with the provisions of this Agreement, the term of this Agreement shall be as described in Exhibit A attached hereto and incorporated herein by reference.

(b)      The term of this Agreement shall be divided into consecutive one (1) year periods. During any such period, WCW may terminate this agreement with or without cause after giving Wrestler at least three (3) months prior written notice of such

7

WCW 0495

PAGE.09

termination. Any such termination shall be effective at the end of the then-current one (1) year period.

(c) Wrestler may terminate this Agreement upon the occurrence of any material breach of any provision hereof by WCW which remains uncured for a period of fifteen (15) consecutive days after Wrestler has provided WCW with written notice of the breach.

(d) WCW may immediately terminate this Agreement upon the occurrence or at any time during the continuation of any material breach of any provision hereof by Wrestler.

(e) WCW may terminate this Agreement or suspend Wrestler without pay, for "Good Cause" by written notice setting forth the reason for such termination or suspension. For the purposes of this Agreement, the WCW shall have "Good Cause" for termination of Wrestler's Agreement or suspension without pay (i) if Wrestler is convicted of or pleads guilty to any felony or a crime involving theft, fraud, or moral turpitude; (ii) if Wrestler intentionally violates any law, rule, regulation or order of any governmental authority, thereby exposing WCW, its parent, subsidiaries or any affiliated entity of the WCW to potential civil or criminal penalties; (iii) if Wrestler fails to adequately or completely perform any of his duties or obligations hereunder, whether express or implied; (iv) if Wrestler fails to follow the direction of WCW's officers; (v) if Wrestler engages in conduct or activities involving moral turpitude materially damaging to the business or reputation of WCW; (vi) if Wrestler violates the WCW Substance Abuse Policy; (vii) if Wrestler otherwise breaches any provision or representation of this agreement; or (viii) if Wrestler intentionally misappropriates for his own purpose and

8

WCW 0496

benefit any property of the WCW, its parent, subsidiaries or any affiliated entity of WCW or appropriates any corporate opportunity of WCW, its parent, subsidiaries or any affiliated entity of WCW. Wrestler acknowledges that a waiver by WCW of its rights with respect to any provision of this paragraph in one instance will not be deemed to constitute a waiver of its rights with respect to the same or a similar breach thereafter.

(f)     This Agreement shall terminate automatically upon the death of Wrestler.

(g)     The following shall govern in the event of incapacity of Wrestler for any reason:

(i) For the purposes of this Agreement, "Incapacity" shall be defined as Wrestler's inability to perform all of the physical requirements of the Services, as determined by WCW. WCW may, at its option and expense, require Wrestler to be evaluated by a physician selected by WCW for purposes of determination of Incapacity.

(ii) In the event of Incapacity, Wrestler shall continue to receive his full compensation payments for the first cumulative thirty (30) calendar days of Incapacity per contract year, and the Agreement shall remain in full force.

(iii) If, Wrestler remains incapacitated after the initial thirty (30) day Incapacity period, whether consecutive or not, WCW shall have the option, at any point during which Wrestler thereafter remains incapacitated, to terminate this Agreement, without further obligation.

(iv) Unless and until WCW shall exercise such right to terminate this Agreement on the basis of Incapacity, WCW shall (a) continue to pay Wrestler under this Agreement at the rate of 1/3 (33.3%) of the compensation otherwise payable hereunder; or (b) utilize Wrestler for non-wrestling Services and pay Wrestler at the rate of 1/2 (50%) of the compensation otherwise payable hereunder. Wrestler's ability to perform non-wrestling Services shall be determined by WCW. While Wrestler is being paid pursuant to (iv)(a) or (b), all other terms of this Agreement shall remain in full force.

9

WCW 0497

PAGE. 11

(v)  Any reduction in compensation pursuant to this section shall cease upon the earlier of (a) a determination that Wrestler is again able to perform all the physical requirements of the Services; (b) the expiration of this Agreement; or (c) the termination of this Agreement by WCW, as provided for herein.

(h)  Wrestler acknowledges his present eligibility for workers' compensation through WCW.  For so long as WCW maintains worker's compensation coverage, Wrestler agrees to accept the benefits provided by said workers' compensation coverage as his sole and exclusive remedy against WCW, (including its parent, affiliates, employees and agents), for any and all injuries sustained during the Term provided said coverage is maintained by WCW and is in effect with respect to such injury. Notwithstanding anything herein to the contrary, WCW shall not be obligated to maintain workers' compensation coverage.

9.  **Restrictive Covenants**.

(a)  Confidentiality.  "Confidential Information" shall mean any confidential, proprietary, business information or data belonging to or pertaining to WCW that does not constitute a "Trade Secret" (as defined under applicable law) and that is not generally known by or available through legal means to the public. In recognition of WCW's need to protect its legitimate business interests, Wrestler hereby covenants and agrees that Wrestler shall not, unless specifically directed by WCW, for any reason or in any fashion, either directly or indirectly use, disclose, transfer, assign, disseminate, reproduce, copy, or otherwise communicate any: Confidential Information, at all times during his contractual relationship with WCW and for a period of one (1) year following the termination thereof for any reason; and Trade Secrets, at all times such information remains a "trade secret" under applicable law. During the Term, Wrestler shall: exercise

10

his best efforts to ensure the continued confidentiality of all Trade Secrets and Confidential Information of WCW known by, disclosed to or made available to Wrestler, whether in connection with this Agreement or any other past or present relationship with WCW; immediately notify WCW of any unauthorized disclosure or use of any Trade Secrets or Confidential Information of which Wrestler becomes aware; and assist WCW, to the extent necessary, in the procurement of or any protection of WCW's rights to or in any of the Trade Secrets or Confidential Information.

(b)    Noncompetition. During the Term and within the Territory of this Agreement, Wrestler shall perform the Services exclusively for WCW and shall not, directly or indirectly, be employed by, perform services for, or engage or be connected in any manner with any other business entity without the express written consent of WCW. Wrestler expressly covenants and agrees that for a period of one hundred and twenty (120) days after any termination or expiration of this Agreement, for any reason (the "Non-Compete Period"), he shall not provide those Services specifically delineated in sections 1(a)(i) and (ii) to any other individual, company or business in the United States, Canada and Japan. In addition, during the Non-Compete Period, Wrestler shall not appear or perform in any media (including but not limited to broadcast, pay-per-view and cable television, video replay, telephone hot-line, radio, magazine and internet) in any manner or capacity relating to wrestling or any other related professional, entertainment or athletic event for or on behalf of Titan Sports, Inc. (WWF) or HHG Corporation (ECW) in the United States, Canada and Japan or for broadcast therein. Wrestler acknowledges that the Non-Compete Period shall be increased to six (6) months in the event this Agreement is terminated for Good Cause pursuant to paragraph 8(d).

11

WCW 0499

(c)    Acknowledgment of Reasonableness. The parties expressly acknowledge the reasonableness and content of the covenants and agreements contained in this section.

10.    Notices. All notices and statements provided for or required by this Agreement shall be in writing, and shall be delivered personally to the other designated party, or mailed by certified or registered mail, return receipt requested, or deposited with a recognized national overnight courier service. Notices shall be deemed effective on the earlier of when hand delivered, when deposited with a recognized national overnight courier service or when received by mail.

11.    Miscellaneous.

(a)    This Agreement, and the documents referenced herein, contain the entire agreement and understanding and shall supersede all prior agreements or understandings concerning the subject matter hereof between the parties hereto. No waiver, termination or discharge of this Agreement, or any of the terms or provisions hereof, shall be binding upon either party hereto unless confirmed in writing. This Agreement may not be modified or amended, except by a writing executed by both parties. No waiver by either party of any term or provision of this Agreement or of any default hereunder shall affect such party's rights thereafter to enforce such term or provision or to exercise any right or remedy in the event of any other default, whether or not similar.

(b)    This Agreement is the product of arm's-length negotiations between Wrestler and WCW. Wrestler expressly states that he has had the opportunity to seek and obtain consultation in connection with the negotiation and execution of this Agreement,

12

WCW 0500

and that he fully understands the rights and obligations set forth herein. In the construction and interpretation of this Agreement, no account shall be taken of which party requested or drafted any particular provision or provisions of this Agreement.

(c)    Regardless of the place of execution hereof, this Agreement and all amendments hereto, shall be deemed to have been negotiated, made, entered into and fully performed in the State of Georgia, without regard to the actual location at which Wrestler provides Services to WCW. This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of Georgia applicable to contracts made, entered into and performed entirely therein, without giving effect to its conflict of laws provisions. Wrestler and WCW hereby (i) submit to the jurisdiction of the United States District Court for the Northern District of Georgia and of any Georgia state court sitting in Atlanta for the purposes of all legal proceedings arising out of or relating to this Agreement and (ii) irrevocably waive, to the fullest extent permitted by law, any objection which it may now or hereafter have to the venue of any such proceeding which is brought in such a court. Additionally, the parties hereto agree that the State of Georgia shall be the exclusive forum and situs for the resolution of any and all disputes, controversies or matters arising herefrom or related hereto. Wrestler's Home Base is identified solely for travel purposes and shall not affect the choice of law, jurisdiction or venue hereunder.

(d)    The parties further agree, notwithstanding the consideration provided for herein, that because of the special, unique and extraordinary nature of the Services hereunder and of the rights and licenses which are the subject matter of this Agreement, WCW shall be entitled to injunctive and other equitable relief to prevent any

WCW 0501

breach or default by Wrestler hereunder, and such relief shall be without prejudice to any other rights or remedies of WCW as may be provided by law.

(e)     WCW may hereby assign its rights and delegate its obligations under this Agreement, and if such assignee shall assume WCW's obligations in writing, WCW shall have no further obligations to Wrestler.  Wrestler may not assign this Agreement, in whole or in part, without the prior written consent of WCW, and any attempted assignment not in accordance herewith shall be null and void and of no force or effect.

(f)     This Agreement shall be binding on Wrestler and his successors and permitted assigns.

(g)     Nothing herein shall be deemed to obligate WCW to use the services of Wrestler and WCW shall have fully discharged its obligations hereunder by paying the amount specified herein.

(h)     With respect to WCW's rights hereunder, WCW shall have the sole right and discretion to bring any and all claims including but not limited to infringement or unfair competition claims.

(i)     The headings contained herein are for the convenience of the parties only and shall not be interpreted to limit or affect in any way the meaning of the language contained  in this Agreement.

(j)     This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute the same Agreement.  Any signature page of any such counterpart, or any electronic facsimile thereof, may be attached or appended to any other counterpart to complete a

14

fully executed counterpart of this Agreement, and any telecopy or other facsimile transmission of any signature shall be deemed an original and shall bind such party.

(k)     If any provision of this Agreement shall be held void, voidable, invalid or inoperative, no other provision of this Agreement shall be affected as a result thereof, and accordingly, the remaining provisions of this Agreement shall remain in full force and effect as though such void, voidable, invalid or inoperative provision had not been contained herein.

(l)     Upon the request of WCW, Wrestler agrees to take any and all actions, including, without limitation, the execution of certificates, documents or instruments, necessary or appropriate to give effect to the terms and conditions set forth in this Agreement.

(m)     Notwithstanding any termination of this Agreement, all provisions which, by their terms or reasonable interpretation thereof, sets forth obligations that extend beyond the termination of this Agreement hereof shall survive and remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed or caused their duly authorized representatives to execute this Agreement to be effective as of the day and year first above written.

"WRESTLER"                                      "WCW"

SIDNEY R. EUDY

Signature: _____            By: _____

Printed Name: _Sidney R Eudy_         Title: _____

15

# INDEPENDENT CONTRACTOR AGREEMENT

## FOR: SIDNEY R. EUDY aka SID VICIOUS

## EXHIBIT "A"

**COMPENSATION:**   In consideration of Wrestler's grant of the rights, licenses and services hereunder, and provided Wrestler faithfully and fully performs all of his obligations hereunder, WCW shall pay Wrestler as follows:

| Year 1 | June 9, 1999 through June 8, 2000 | $800,000 |
| Year 2 | June 9, 2000 through June 8, 2001 | $850,000 |
| Year 3 | June 9, 2001 through June 8, 2002 | $900,000 |

In addition, in the event Wrestler appears and performs on-air at any WCW Pay Per View event as instructed by WCW during the Term, WCW shall pay Wrestler a Pay Per View bonus as follows:

| Year 1 | $50,000 per Pay Per View event |
| Year 2 | $55,000 per Pay Per View event |
| Year 3 | $60,000 per Pay Per View event |

Wrestler shall be paid for a minimum of eight (8) Pay Per View events per contractual year.

**TERM:**   This Agreement shall commence as of June 9, 1999 and shall continue until June 8, 2002.

**TRAVEL:**  When required to travel for WCW business, WCW shall provide Wrestler with a rental car, hotel accommodations and First Class air transportation.

**HOME BASE:** Memphis, TN

16

**SPECIAL PROVISIONS:** Wrestler shall not be required to perform the Services hereunder in excess of one hundred and eighty (180) days per contractual year (exclusive of travel).

**ADDRESS:** 210 River Trace, Marion, Arkansas 72364

**SOCIAL SECURITY NUMBER:** 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

_____           _____
WRESTLER                                    WORLD CHAMPIONSHIP WRESTLING, INC.

17

WCW 0505

IN THE STATE COURT OF FULTON COUNTY
STATE OF GEORGIA

SIDNEY R. EUDY,                )
                              )
    Plaintiff,                )
                              )            Civil Action File No.
v.                            )
                              )
UNIVERSAL WRESTLING           )
COMPANY, INC. f/k/a WORLD     )
CHAMPIONSHIP WRESTLING,       )
INC., TURNER SPORTS INC., and )
TURNER ENTERTAINMENT          )
GROUP, INC. and PARTIES X, Y and )
Z,                            )
                              )
    Defendants.

## COMPLAINT

Comes Now Plaintiff Mr. Sidney R. Eudy, professionally known as Sid Vicious,

and files this Complaint and further shows the Court as follows:

### PARTIES AND JURISDICTION

1.

Plaintiff Sidney R. Eudy ("Mr. Eudy") is a resident of the State of Arkansas. Mr.

Eudy entered into contracts with one or more of the Defendants in the State of Georgia as

a professional wrestler.

2.

Defendant Universal Wrestling Corporation, Inc., a Georgia corporation,

was formerly known as World Championship Wrestling, Inc., a Georgia Corporation

("WCW"). Defendant Universal Wrestling Corporation, Inc.'s address is 75 Rockefeller

Plaza, J. Cannon, New York, NY 10019. Defendant Universal Wrestling Corporation

-1-



EXHIBIT
B

can be served through its registered agent, CT Corporation System, 1201 Peachtree Street, NE, Atlanta, Georgia 30361. Defendant Universal Wrestling Corporation, Inc. is subject to the jurisdiction of this Court.

3.

Defendant Turner Sports, Inc. is a Georgia corporation and may be served through its registered agent in Georgia, CT Corporation System, 1201 Peachtree Street, NE, Atlanta, Georgia 30361. Defendant Turner Sports, Inc.'s address is 75 Rockefeller Plaza, J. Cannon, New York, NY 10019. Defendant Turner Sports Inc. is subject to the jurisdiction of this Court.

4.

Defendant Turner Entertainment Group Inc. is a Georgia corporation and may be served through its registered agent in Georgia, CT Corporation System, 1201 Peachtree Street, Atlanta, Georgia 30361. Defendant Turner Entertainment Group Inc.'s address is 75 Rockefeller Plaza, J. Cannon, New York, NY 10019. Defendant Turner Entertainment Group Inc. is subject to the jurisdiction of this Court.

5.

Mr. Eudy believes that other persons, corporations and/or entities may have participated in and/or may be liable to him for the matters described herein and Plaintiff designates these parties as Defendant Parties X, Y and Z. Mr. Eudy will amend his Complaint after the identities and liability are known. Such parties may include employees, principals, stockholders, officers, directors, agents, representatives, independent contractors and/or joint venturers of one or more of Defendants.

-2-

### 6.

Venue is proper in this Court.

## STATEMENT OF THE FACTS

### 7.

WCW entered into contracts and agreements for the services of Mr. Eudy as a professional wrestler. This suit arises out of Defendants' wrongful termination and breach of that contract. In connection with the wrongful termination, Defendants falsely asserted that Mr. Eudy was incapacitated, even though Defendants had no intention of utilizing Mr. Eudy's services and even though Mr. Eudy was not in fact incapacitated. Defendants' asserted reason for the wrongful termination was and is a mere pretext. Further, Defendants caused such alleged incapacity and then wrongfully terminated his services. Defendants' true reason for the termination is its desire to avoid paying the compensation owed under the various contracts and agreements for Mr. Eudy's services.

## BACKGROUND

### 8.

Mr. Eudy has performed in professional wresting area for fifteen years.

### 9.

Mr. Eudy has wrestled under the stage names of "Lord Humongous," "Sid Justice," and "Sid Vicious."

### 10.

Mr. Eudy developed a degree of notoriety for his skills and characters.

11.

During the term of his agreement, Mr. Eudy performed well and always exhibited a great work ethic and went above and beyond others in maintaining his character and physicality for the betterment of himself and Defendants.

12.

WCW was a company that was engaged in the professional wrestling business. WCW was and is a "division of Turner Sports" for more than ten years.

13.

Defendants have entered into contracts or agreements with a number of individuals for their services as professional wresters with WCW, including Mr. Eudy. Under many of these contracts, WCW is required to pay the agreed-upon compensation for the professional wrestlers' services, regardless of whether or not Defendants elect to actually use those services at any of its wrestling events.

**THE AGREEMENT**

14.

WCW entered into an Independent Contract Agreement with Mr. Eudy dated as of June 9, 1999 (herein referred to as the "Agreement").

15.

The Agreement, among other things, sets forth the compensation that WCW agrees to pay for Mr. Eudy's services.  The Agreement provides for a three-year term, commencing June 9, 1999, and extending through June 8, 2002.

-4-

16.

Under the Agreement, the parties agreed that Mr. Eudy would be paid for a total of twenty-four (24) pay per view ("PPV") Events for WCW, to consist of eight PPV Events for each of the three years of the Agreement. The compensation for each PPV was an escalating figure for each year of the contract.

17.

The parties also agreed that Mr. Eudy would perform other services for WCW at a certain number of "other non-PPV Events", but the Agreement specifies that the "other non-PPV Events shall be non-wrestling appearances, unless otherwise agreed upon by the parties".

18.

Accordingly, under the Agreement, Mr. Eudy was not required to wrestle at more than eight Events per year. Under the Agreement, Mr. Eudy was not required to wrestle at any other events promoted by WCW, including Nitro, Thunder, or non-televised house shows.

19.

Under the Agreement, Defendants are not obligated to utilize Mr. Eudy's services. However, the Agreement specifies that Defendants are required to pay the compensation set forth in the Agreement even if WCW elects not to use Mr. Eudy's services.

20.

Under the Agreement, Mr. Eudy was required to follow the directions of Defendants and their employees.

21.

Under the Agreement, Mr. Eudy was required perform services only for WCW.

22.

The Agreement included an optional workers' compensation insurance program and an insurance policy. This insurance policy and/or workers' compensation insurance program was supposed to pay in the event that Mr. Eudy was injured. Upon information and belief, Defendants were the named insured under the policy(ies) and received payment as a result of Mr. Eudy's injuries. Further, the amount of the policy(ies) was and/or is the same as the value of Mr. Eudy's Agreement.

23.

Defendants promoted and produced a variety of wrestling events. These events included weekly live television shows and weekly taped television shows.

24.

These events included frequent non-televised arena shows, referred to as "house shows."

25.

Defendants promoted and produced a monthly pay-per-view telecast ("PPV"). These events are broadcast through cable and satellite transmission across the United States. These shows require the audience to pay for the ability to view the event.

## THE EVENTS

26.

In the early part of 2000, Mr. Eudy was the champion of WCW.

27.

Mr. Eric Bischoff was the president of WCW. Mr. Bischoff was also the president of Turner Entertainment Group, Inc.

28.

Mr. Vince Russo was vice president of WCW and was in charge of the development of the shows.

29.

During this time, Mr. Eudy was injured. Mr. Bischoff and Mr. Russo agreed that Mr. Eudy would not have to perform any physical acts in his next few appearances because of his injuries. They insisted that he make appearances even when Mr. Eudy should have been attempting to heal himself and attend physical therapy for the benefit of Defendants.

30.

On once occasion when Mr. Eudy appeared at an event, the agents demanded that Mr. Eudy fall through a table and lose the match.

31.

Mr. Bischoff and Mr. Russo promised that if Mr. Eudy did this for both of the live shows that he would not have to perform for the next PPV but he would receive his full pay, $50,000, for that PPV. Mr. Bischoff and Mr. Russo promised that Mr. Eudy would be given time to heal and to complete his physical therapy. Mr. Eudy reluctantly agreed especially since he was going to finally get time to heal and recuperate from his injuries incurred for the benefit of Defendants.

32.

Instead of abiding by the agreement, Defendants cut Mr. Eudy's pay in half while he under-going physical therapy.

33.

Mr. Eudy was constantly required to make promotional appearances even though he was termed "disabled" and receiving one half of his pay.  These appearances included a ten-day appearance in Australia and Los Angeles, California, from which he was hospitalized upon his return home.

34.

Mr. Eudy was even forced to do live television performances where he had been promised that there would be nothing physical merely an appearance. Each time the "booker" who was an employee or agent of Defendants had a physical incident occur. These physical incidents prolonged Mr. Eudy's recovery from his injuries.  Defendants' employees and agents told Mr. Eudy that his appearances were necessary for the survival of the company whose ratings were low.

35.

In December of 2000, Defendants promised Mr. Eudy that he would be the main event on a PPV with the entire story line built around him.  Mr. Terry Taylor who was employed by and/or worked for Defendants as an "agent" told Mr. Eudy to get an early release from anyone to do this PPV. Mr. Taylor and others who were employed by or acting on behalf of Defendants informed Mr. Eudy that the company was depending on him to perform at this PPV to raise ratings.

36.

Mr. Eudy discussed his promised $50,000 for the earlier PPV with Ms. Diana Meyers, an employee of Defendants. Ms. Meyers promised that if Mr. Eudy was released to work he would receive his full compensation including the $50,000.

37.

On December 1, 2000, Mr. Eudy's physician released him to work.

38.

On December 5, 2000, Ms. Meyers as counsel for WCW, a division of Turner Sports and a Time Warner Company, restored Mr. Eudy's compensation by written correspondence. However, the promised $50,000 was still not paid.

39.

Mr. Johnny Ace was a "booker" for Defendants. He was employed by one or all of Defendants.

40.

Mr. Ace constantly insisted that Mr. Eudy leap from the top ropes of the ring and to land on his opponents. Mr. Eudy refused to perform this move stating that he had "ring rust", e.g. was not yet accustomed to being back in the wrestling ring, and that he did not think that a man of his size should perform such a stunt. Mr. Ace continued to insist, even though Mr. Eudy had not completely healed from his prior injury and was forced to get an early release from the hospital.

41.

Mr. Eudy did not agree jumping from the ropes surrounding the ring was particularly safe in light of his size, six feet, nine inches and weight, two hundred ninety-five pounds.

42.

On January 14, 2001, Mr. Eudy was to perform at a PPV in Indianapolis. Mr. Ace handed Mr. Eudy a script. This script finished with Mr. Eudy leaping from the top ropes onto his opponent.

43.

Mr. Eudy tried to refuse to perform this move. Mr. Ace and others who were employees and agents of Defendants insisted that Mr. Eudy perform this move citing his contract, and his duty to help the company which needed better ratings.

44.

Mr. Eudy reluctantly performed the move and suffered a double compound fracture of his left leg. Mr. Eudy's leg bones protruded through the skin and his boots on nationally broadcast television. Mr. Eudy was in horrific agony lying on his back on the stage.

45.

Mr. Eudy was immediately transported to Methodist Hospital for emergency surgery.

46.

Mr. Ace came to the hospital to visit Mr. Eudy and apologized repeatedly stating that he was sorry that he forced Mr. Eudy to perform the move.

-10-

47.

While Mr. Eudy was recovering in the hospital, Defendants broadcasted the incident repeatedly on the live show. Defendants were taking advantage of Mr. Eudy's horrific injury to gain ratings. Defendants succeeded and received high ratings for the live show. These ratings translated into higher earnings for Defendants for these shows.

48.

The following week, Defendants brought in Dr. Andrews, one of Mr. Eudy's physicians, to appear on WCW, even though Mr. Eudy never saw Dr. Andrews with respect to his leg injury. Defendants had Dr. Andrews describe the injury in graphic detail, show x-rays and explain the surgery and recovery. Once again, Defendants were trying to increase their ratings by taking advantage of Mr. Eudy's injury and misery. Further, they shared confidential medical information with the general public without the permission of Mr. Eudy.

49.

After the injury, Defendants wrongfully cut Mr. Eudy's pay in half again while he was recovering from the injuries sustained because of the insistence of one of its employees. Defendants cut Mr. Eudy's pay even though they were profiting from the horrible injury that Mr. Eudy suffered on their behalf and at their insistence.

50.

On February 19, 2001, Mr. Eudy received a letter from U.S. Benefit Consultants. This company allegedly provided disability payments for Mr. Eudy. However, upon information and belief, this company had an insurance policy(ies) which listed Defendants as the beneficiary in the event that Mr. Eudy was injured. The benefit was the

full value of Mr. Eudy's contract. Mr. Eudy completed the disability forms and sent them to US Benefit Consultants. Mr. Eudy did not receive payment from U.S. Benefit Consultants or the insurer.

51.

███████████, Ms. Meyers of WCW, a division of Turner Entertainment and a time Warner Company, terminated Mr. Eudy's contract. This termination was improper and in breach of the Agreement. Ms. Meyers indicated over the telephone and in her letter that Mr. Eudy should contact the company that purchases WCW to get another contract. Defendants had terminated Mr. Eudy because of the injury that they caused.

52.

Mr. Eudy is currently not employed as a professional wrestler.

53.

Mr. Eudy has gone through extensive rehabilitation. The recovery process has been long and extremely painful.

## MAJOR CHANGES AT WCW

54.

Although Mr. Eudy has remained ready to perform under the Agreement as requested, WCW went through significant changes during the early part of the year 2000. WCW changed its operating management on at least two occasions in 2000.

55.

There were numerous press reports that WCW's parent corporation, Time Warner, Inc., embarked on a program of reducing or eliminating WCW's contractual obligations, as a prelude to Time-Warner's merger with America Online, Inc.

-12-

56.

During his wrestling tenure with Defendants, Mr. Eudy received paychecks issued by Defendant Turner Sports Inc. that showed WCW as an affiliated entity.

57.

Mr. Eudy received correspondence from WCW on stationary letterhead which specifically represented that WCW was a division of Turner Sports, stating, "World Championship Wrestling [,] A Division of Turner Sports."

58.

Defendants Turner Sports, Inc. and WCW shared the same business address, One CNN Center, Atlanta, Georgia.

59.

Defendants Turner Sports, Inc. and Turner Entertainment Group, Inc. dominated and controlled the business activities of WCW.

60.

Defendants Turner Sports, Inc. and Turner Entertainment Group, Inc.'s executives managed and operated the business of WCW and paid wrestlers' salaries.

61.

Defendant Turner Sports, Inc. and Defendant Turner Sports Entertainment Group, Inc. had their employees direct the activities of WCW.

62.

WCW, as a division of Turner Sports and/or Turner Entertainment, acted as Defendant Turner Sports, Inc. and/or Turner Entertainment Group, Inc.'s agent in

connection with operation of the business. As such, Defendants Turner Sports, Inc. and Turner Entertainment Group, Inc. are vicariously liable for the conduct of WCW.

63.

Defendants Turner Sports, Inc., Turner Entertainment Group, Inc. and WCW acted as joint venturers in the business operations of WCW as a wrestling enterprise.

64.

WCW was the alter ego of Defendants Turner Sports, Inc. and Turner Entertainment Group, Inc. Defendants Turner Sports, Inc. and Turner Entertainment Group, Inc. have commingled their assets with those of WCW, have controlled the business of WCW to advance and further their own business purposes, and have abused and disregarded the corporate form and, therefore, the corporate veil should be pierced.

65.

Recently, Defendant Turner Entertainment Group, Inc. and/or AOL Time Warner sold WCW to World Wrestling Federation Entertainment, Inc. ("WWF"). In this transaction, certain assets were sold to WWF, including but not limited to the right to use the name "WCW". However, the contracts of certain wrestlers were not similarly transferred. WWF uses the name "WCW" but not its employees, equipment, etc.

66.

WCW now does not perform shows but has changed its name to Universal Wrestling Company, Inc., a Georgia corporation. Upon information and belief, this corporation merely exists for the benefit of the remaining liabilities of WCW.

-14-

## COUNT ONE

## BREACH OF CONTRACT

### 67.

Mr. Eudy adopts, re-alleges and incorporates herein and above by reference all allegations contained in Paragraphs 1 through 66 of the Complaint fully and completely as if set forth herein

### 68.

Mr. Eudy had entered into various oral, written, express and implied agreements with Defendants, including but not limited to, oral promise to pay Mr. Eudy for a PPV event in April, 2000 and the Agreement.

### 69.

Defendants breached the terms of the Agreement, by among other things, improperly reducing Mr. Eudy's pay, failing to pay Mr. Eudy, reducing Mr. Eudy's pay when he was still performing for Defendants benefit, and terminating his Agreement.

### 70.

Mr. Eudy's contract provided that "Wrestler shall be paid for a minimum of eight (8) Pay Per View events per contractual year." This guaranteed compensation is in addition to Mr. Eudy's regular salary. Mr. Eudy was only paid for six PPV during Year Two of his Agreement. Defendants have breached their agreement by failing to pay this amount for Year Two, which is $110,000.

71.

Defendants, by and through Mr. Eric Bischoff and Mr. Vince Russo, and Mr. Eudy agreed that Mr. Eudy would be paid $50,000 for a PPV Event that Mr. Eudy would not have to appear at. This agreement was further ratified by Ms. Diana Meyers.

72.

Mr. Eudy was not paid anything in Year Three of his Agreement because the Agreement was unlawfully and improperly terminated by Defendants. Defendants have breached their agreement by failing to pay this $1,380,000 in compensation.

73.

Defendants improperly and in breach of the Agreement with Mr. Eudy reduced his pay during Year Two of his Agreement.

74.

By all of these acts, Defendants breached their duties of good faith and fair dealing.

75.

As a direct and proximate result of Defendants' acts, Mr. Eudy has suffered harm, including the loss of his pay under the Agreement, loss of endorsements, and status as a performer.

76.

Mr. Eudy is entitled to damages for the breaches of the agreements, including but not limited to payment for the two guaranteed PPV events for 2000/2001 at $55,000 per event, the full value of remainder of the Agreement from June 1, 2001 until July 1, 2002, (Year Three - $1,380,000.) repayment of improperly reduced salary during the term of his

agreement, payment for the $50,000 PPV promised by Mr. Bischoff, Mr. Russo and Ms. Meyers as officer and employees of WCW and Defendants, and such other damages resulting from Defendants' breaches.

### COUNT TWO

### BREACH OF FIDUCIARY DUTY

77.

Mr. Eudy adopts, re-alleges and incorporates herein and above by reference all allegations contained in Paragraphs 1 through 76 of the Complaint fully and completely as if set forth herein

78.

Mr. Eudy was an independent contractor for Defendants and provided skills and services for which Defendants received financial benefits. Mr. Eudy was convinced to perform acts which were injurious and dangerous to him for the benefit of the company and to drive up ratings.

79.

Mr. Eudy performed acts for the benefit of Defendants at Defendants' insistence, including, but not limited to, making appearances, performing while injured and other acts.

80.

At Defendants' insistence and for the expressed benefit of Defendants, Mr. Eudy performed a leap from the top ropes of the ring resulting in both of the bones in his legs being broken.

81.

When Mr. Eudy was severely injured on the PPV as a result of Defendants' acts.
Defendants improperly and in bad faith reduced Mr. Eudy's pay and then terminated his
contract.

82.

Defendants capitalized on the nature and severity of Mr. Eudy's injuries, incurred
as a result of Defendants' misconduct, and replayed the incident of live television
repeatedly, used it as a focal point for the following weeks' show by having Mr. Eudy's
physician's show x rays of Mr. Eudy's leg, describing the nature and extent of the injury
and the surgery necessary for such injury and otherwise advertising and promoting the
injury. This promotion resulted in higher ratings and income for Defendants. Defendants
retained the benefits of this incident even though Defendants had cut Mr. Eudy's pay and
then terminated his contract shortly thereafter.

83.

As Mr. Eudy's contractor, employer, performance league and/or as the prime
beneficiary of Mr. Eudy's labors, Defendants owed duties to Mr. Eudy, including
fiduciary duties, duties of good faith and fair dealing.

84.

As a result of Defendants' misconduct, Mr. Eudy has suffered damages, including
but not limited to the loss of his Agreement with Defendants, the loss of income
associated with his performance, the loss of future revenue from his performances and
other damages.

85.

Defendants' conduct was grossly intentional, negligent, reckless, willful, wanton, malicious, oppressive, and/or unmindful of their duty and obligations to Plaintiffs and/or exhibited that entire want of care which would raise the presumption of conscious indifference to consequences so as to warrant the imposition of punitive damages in an amount sufficient to punish, penalize, and/or deter Defendants from similar conduct in the future.

## COUNT THREE

## UNJUST ENRICHMENT

86.

Mr. Eudy adopts, re-alleges and incorporates herein and above by reference all allegations contained in Paragraphs 1 through 85 of the Complaint fully and completely as if set forth herein.

87.

Defendants had an insurance policy(ies) covering Mr. Eudy.

88.

Upon information and belief, this policy(ies) covered the full value of Mr. Eudy's Agreement.

89.

Defendants capitalized on the nature and severity of Mr. Eudy's injuries, incurred as a result of Defendants' misconduct, and replayed the incident of live television repeatedly, used it as a focal point for the following weeks' show by having Mr. Eudy's physician's show x rays of Mr. Eudy's leg, describing the nature and extent of the injury

and the surgery necessary for such injury and otherwise advertising and promoting the injury. This promotion resulted in higher ratings and income for Defendants. Defendants retained the benefits of this incident even though Defendants had cut Mr. Eudy's pay and then terminated his shortly thereafter.

90.

Upon Mr. Eudy's injury, which was caused by the misconduct of Defendants, Defendants retained the proceeds of the insurance policy and profited from the higher ratings from the severity of Mr. Eudy's injury and was, thereby, unjust enriched.

91.

The ill gotten proceeds, including but not limited to the insurance proceeds, and the proceeds from the raised ratings, should be disgorged and given to Mr. Eudy.

COUNT FOUR

ATTORNEYS' FEES

92.

Plaintiffs adopt, re-allege and incorporate herein and above by reference all allegations contained in Paragraphs 1 through 91 of the Complaint fully and completely as if set forth herein.

93.

Defendant Universal Wrestling Corporation, Inc., Defendant Turner Sports, Inc. and/or Defendant Turner Entertainment Group, Inc. have acted in bad faith, been stubbornly litigious, and have caused Mr. Eudy unnecessary trouble and expense.

94.

Pursuant to O.C.G.A.§ 13-6-11, Mr. Eudy is entitled to recovery of expenses of litigation and attorneys' fees.

95.

Mr. Eudy therefore requests reasonable attorneys' fees, costs and other expenses of litigation, and any other damages within the discretion of this Court to grant.

WHEREFORE, Mr. Eudy respectfully requests that the Court grant him judgment against Defendants as follows:

a.    That process be issued and served as provided by law requiring Defendants to appear and answer and face judgment;

b.    That as to Count I, Mr. Eudy receive judgment in an amount to be determined at trial by the finder of fact against Defendants, jointly and severally, for general, special, actual, and compensatory damages;

c.    That as to Count II, Mr. Eudy receive judgment in an amount to be determined at trial by the finder of fact against Defendants, jointly and severally, for general, special, actual, compensatory and punitive damages;

d.    That as to Count III, Mr. Eudy receive judgment in an amount to be determined at trial by the finder of fact against Defendants, jointly and severally;

e.    That as to Count IV, Mr. Eudy recover the costs associated with this litigation including, but not limited to, attorneys' fees;

f.    That as to Counts II that there be no limitation of punitive damages or treble damages pursuant to O.C.G.A. § 51-12-5.1(f);

g.   That the Court award pretrial and post trial interest on any amounts found to be

owed to Mr. Eudy; and,

h.   That the Court grant such other and further relief as it deems just and proper.

JURY TRIAL REQUESTED.

Respectfully submitted this $28^{+}$ day of January, 2002.

COUNSEL FOR PLAINTIFF
MR. SIDNEY R. EUDY

By: _____
STEPHEN G. WEIZENECKER
Georgia Bar No. 746451
KIM KNIGHT PEREZ
Georgia Bar No. 572125

WEIZENECKER, ROSE,
MOTTERN & FISHER, PC
1800 Peachtree Street, NW, Suite 620
Atlanta, Georgia 30309
(404) 365-9799

-22-



IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

SIDNEY R. EUDY, )
)
Plaintiff, )
)
v. )   Civil Action File No. 02CV48513
)
UNIVERSAL WRESTLING )
COMPANY, INC. f/k/a WORLD )
CHAMPIONSHIP WRESTLING, )
INC., TURNER SPORTS, INC., and )
TURNER ENTERTAINMENT )
GROUP, INC., JOHNNY )
LAURINAITIS, and PARTIES X, Y )
and Z, )
)
Defendants. )

## SECOND AMENDED COMPLAINT

COMES NOW the Plaintiff, Sidney R. Eudy, and pursuant to O.C.G.A. §9-11-15(a), files
this Amended Complaint, and further shows the Court as follows:

## JURISDICTION AND VENUE

1.

Plaintiff Sidney R. Eudy ("Mr. Eudy") is a resident of the State of Arkansas. Mr. Eudy
entered into contracts with one or more of the Defendants in the State of Georgia as a
professional wrestler.

2.

Defendant Universal Wrestling Corporation, Inc. ("UWC"), a Georgia corporation, was
formerly known as World Championship Wrestling, Inc., a Georgia Corporation ("WCW").
UWC's address is 75 Rockefeller Plaza, J. Cannon, New York, NY 10019. UWC can be served


EXHIBIT
C

through its registered agent, CT Corporation System, 1201 Peachtree Street, NE, Atlanta,

Georgia 30361.  UWC is subject to the jurisdiction of this Court.

3.

Defendant Turner Sports, Inc. ("TSI") is a Georgia corporation and may be served

through its registered agent in Georgia, CT Corporation System, 1201 Peachtree Street, NE,

Atlanta, Georgia 30361.  TSI's address is 75 Rockefeller Plaza, J. Cannon, New York, NY

10019.  TSI is subject to the jurisdiction of this Court.

4.

Defendant Turner Entertainment Group Inc. ("TEG") is a Georgia corporation and may

be served through its registered agent in Georgia, CT Corporation System, 1201 Peachtree Street,

Atlanta, Georgia 30361.  TEG's address is 75 Rockefeller Plaza, J. Cannon, New York, NY

10019.  TEG is subject to the jurisdiction of this Court.

5.

Defendant Johnny Laurinaitis ("Mr. Laurinaitis," "Johnny Ace" or "Mr. Ace") is a

resident of Florida, and may be served personally through his attorneys, James A. Lamberth and

Joel P. Howle, Troutman Sanders, LLP, 600 Peachtree Street, NE, Bank of America Plaza, Suite

5200, Atlanta, Fulton County, Georgia 30308-2216.

6.

Venue is proper in this Court.

## STATEMENT OF THE FACTS

7.

WCW entered into contracts and agreements for the services of Mr. Eudy as a

professional wrestler.  This suit arises out of Defendants' wrongful termination and breach of

that contract. In connection with the wrongful termination, Defendants falsely asserted that Mr.
Eudy was incapacitated, even though Defendants had no intention of utilizing Mr. Eudy's
services and even though Mr. Eudy was not in fact incapacitated. Defendants' asserted reason
for the wrongful termination was and is a mere pretext. Further, Defendants caused such alleged
incapacity and then wrongfully terminated his services. Defendants' true reason for the
termination is its desire to avoid paying the compensation owed under the various contracts and
agreements for Mr. Eudy's services.

### BACKGROUND

#### 8.

Mr. Eudy has performed in professional wresting area for fifteen years.

#### 9.

Mr. Eudy has wrestled under the stage names of "Lord Humongous," "Sid Justice," and
"Sid Vicious."

#### 10.

Mr. Eudy developed a degree of notoriety for his skills and characters.

#### 11.

During the term of his agreement, Mr. Eudy performed well and always exhibited a great
work ethic and went above and beyond others in maintaining his character and physicality for the
betterment of himself and Defendants.

#### 12.

WCW was a company that was engaged in the professional wrestling business. WCW
was and is a "division of Turner Sports" for more than ten years.

13.

Defendants have entered into contracts or agreements with a number of individuals for their services as professional wrestlers with WCW, including Mr. Eudy. Under many of these contracts, WCW is required to pay the agreed-upon compensation for the professional wrestlers' services, regardless of whether or not Defendants elect to actually use those services at any of its wrestling events.

## THE AGREEMENT

14.

WCW entered into an Independent Contract Agreement with Mr. Eudy dated as of June 9, 1999 (herein referred to as the "Agreement").

15.

The Agreement, among other things, sets forth the compensation that WCW agrees to pay for Mr. Eudy's services. The Agreement provides for a three-year term, commencing June 9, 1999, and extending through June 8, 2002.

16.

Under the Agreement, the parties agreed that Mr. Eudy would be paid for a total of twenty-four (24) pay per view ("PPV") Events for WCW, to consist of eight PPV Events for each of the three years of the Agreement. The compensation for each PPV was an escalating figure for each year of the contract.

17.

The parties also agreed that Mr. Eudy would perform other services for WCW at a certain number of "other non-PPV Events", but the Agreement specifies that the "other non-PPV Events shall be non-wrestling appearances, unless otherwise agreed upon by the parties".

-4-

18.

Accordingly, under the Agreement, Mr. Eudy was not required to wrestle at more than eight Events per year. Under the Agreement, Mr. Eudy was not required to wrestle at any other events promoted by WCW, including Nitro, Thunder, or non-televised house shows.

19.

Under the Agreement, Defendants are not obligated to utilize Mr. Eudy's services. However, the Agreement specifies that Defendants are required to pay the compensation set forth in the Agreement even if WCW elects not to use Mr. Eudy's services.

20.

Under the Agreement, Mr. Eudy was required to follow the directions of Defendants and their employees.

21.

Under the Agreement, Mr. Eudy was required perform services only for WCW.

22.

The Agreement included an optional workers' compensation insurance program and an insurance policy. This insurance policy and/or workers' compensation insurance program was supposed to pay in the event that Mr. Eudy was injured. Upon information and belief, Defendants were the named insured under the policy(ies) and received payment as a result of Mr. Eudy's injuries. Further, the amount of the policy(ies) was and/or is the same as the value of Mr. Eudy's Agreement.

23.

Defendants promoted and produced a variety of wrestling events. These events included weekly live television shows and weekly taped television shows.

24.

These events included frequent non-televised arena shows, referred to as "house shows."

25.

Defendants promoted and produced a monthly pay-per-view telecast ("PPV"). These events are broadcast through cable and satellite transmission across the United States. These shows require the audience to pay for the ability to view the event.

## THE EVENTS

26.

In the early part of 2000, Mr. Eudy was the champion of WCW.

27.

Mr. Eric Bischoff was the president of WCW. Mr. Bischoff was also the president of Turner Entertainment Group, Inc.

28.

Mr. Vince Russo was vice president of WCW and was in charge of the development of the shows.

29.

During this time, Mr. Eudy was injured. Mr. Bischoff and Mr. Russo agreed that Mr. Eudy would not have to perform any physical acts in his next few appearances because of his injuries. They insisted that he make appearances even when Mr. Eudy should have been attempting to heal himself and attend physical therapy for the benefit of Defendants.

30.

On once occasion when Mr. Eudy appeared at an event, the agents demanded that Mr. Eudy fall through a table and lose the match.

-6-

31.

Mr. Bischoff and Mr. Russo promised that if Mr. Eudy did this for both of the live shows that he would not have to perform for the next PPV but he would receive his full pay, $50,000, for that PPV. Mr. Bischoff and Mr. Russo promised that Mr. Eudy would be given time to heal and to complete his physical therapy. Mr. Eudy reluctantly agreed especially since he was going to finally get time to heal and recuperate from his injuries incurred for the benefit of Defendants.

32.

Instead of abiding by the agreement, Defendants cut Mr. Eudy's pay in half while he under-going physical therapy.

33.

Mr. Eudy was constantly required to make promotional appearances even though he was termed "disabled" and receiving one half of his pay. These appearances included a ten-day appearance in Australia and Los Angeles, California, from which he was hospitalized upon his return home.

34.

Mr. Eudy was even forced to do live television performances where he had been promised that there would be nothing physical merely an appearance. Each time the "booker" who was an employee or agent of Defendants had a physical incident occur. These physical incidents prolonged Mr. Eudy's recovery from his injuries. Defendants' employees and agents told Mr. Eudy that his appearances were necessary for the survival of the company whose ratings were low.

35.

In December of 2000, Defendants promised Mr. Eudy that he would be the main event on a PPV with the entire story line built around him. Mr. Terry Taylor who was employed by and/or worked for Defendants as an "agent" told Mr. Eudy to get an early release from anyone to do this PPV. Mr. Taylor and others who were employed by or acting on behalf of Defendants informed Mr. Eudy that the company was depending on him to perform at this PPV to raise ratings.

36.

Mr. Eudy discussed his promised $50,000 for the earlier PPV with Ms. Diana Meyers, an employee of Defendants. Ms. Meyers promised that if Mr. Eudy was released to work he would receive his full compensation including the $50,000.

37.

On December 1, 2000, Mr. Eudy's physician released him to work.

38.

On December 5, 2000, Ms. Meyers as counsel for WCW, a division of Turner Sports and a Time Warner Company, restored Mr. Eudy's compensation by written correspondence. However, the promised $50,000 was still not paid.

39.

Mr. Johnny Ace was a "booker" for Defendants. He was employed by one or all of Defendants.

40.

Mr. Ace constantly insisted that Mr. Eudy leap from the top ropes of the ring and to land on his opponents. Mr. Eudy refused to perform this move stating that he had "ring rust", e.g. was

not yet accustomed to being back in the wrestling ring, and that he did not think that a man of his size should perform such a stunt. Mr. Ace continued to insist, even though Mr. Eudy had not completely healed from his prior injury and was forced to get an early release from the hospital.

41.

Mr. Eudy did not agree jumping from the ropes surrounding the ring was particularly safe in light of his size, six feet, nine inches and weight, two hundred ninety-five pounds.

42.

On January 14, 2001, Mr. Eudy was to perform at a PPV in Indianapolis. Mr. Ace handed Mr. Eudy a script. This script finished with Mr. Eudy leaping from the top ropes onto his opponent.

43.

Mr. Eudy tried to refuse to perform this move. Mr. Ace and others who were employees and agents of Defendants insisted that Mr. Eudy perform this move citing his contract, and his duty to help the company which needed better ratings.

44.

Mr. Eudy reluctantly performed the move and suffered a double compound fracture of his left leg. Mr. Eudy's leg bones protruded through the skin and his boots on nationally broadcast television. Mr. Eudy was in horrific agony lying on his back on the stage.

45.

Mr. Eudy was immediately transported to Methodist Hospital for emergency surgery.

46.

Mr. Ace came to the hospital to visit Mr. Eudy and apologized repeatedly stating that he was sorry that he forced Mr. Eudy to perform the move.

47.

While Mr. Eudy was recovering in the hospital, Defendants broadcasted the incident repeatedly on the live show. Defendants were taking advantage of Mr. Eudy's horrific injury to gain ratings. Defendants succeeded and received high ratings for the live show. These ratings translated into higher earnings for Defendants for these shows.

48.

The following week, Defendants brought in Dr. Andrews, one of Mr. Eudy's physicians, to appear on WCW, even though Mr. Eudy never saw Dr. Andrews with respect to his leg injury. Defendants had Dr. Andrews describe the injury in graphic detail, show x-rays and explain the surgery and recovery. Once again, Defendants were trying to increase their ratings by taking advantage of Mr. Eudy's injury and misery.

49.

After the injury, Defendants wrongfully cut Mr. Eudy's pay in half again while he was recovering from the injuries sustained because of the insistence of one of its employees. Defendants cut Mr. Eudy's pay even though they were profiting from the horrible injury that Mr. Eudy suffered on their behalf and at their insistence.

50.

On February 19, 2001, Mr. Eudy received a letter from U.S. Benefit Consultants. This company allegedly provided disability payments for Mr. Eudy. However, upon information and belief, this company had an insurance policy(ies) which listed Defendants as the beneficiary in the event that Mr. Eudy was injured. The benefit was the full value of Mr. Eudy's contract. Mr. Eudy completed the disability forms and sent them to US Benefit Consultants. Mr. Eudy did not receive payment from U.S. Benefit Consultants or the insurer.

51.

On March 1, 2001, Ms. Meyers of WCW, a division of Turner Entertainment and a time Warner Company, terminated Mr. Eudy's contract. This termination was improper and in breach of the Agreement. Ms. Meyers indicated over the telephone and in her letter that Mr. Eudy should contact the company that purchases WCW to get another contract. Defendants had terminated Mr. Eudy because of the injury that they caused.

52.

Mr. Eudy is currently not employed as a professional wrestler.

53.

Mr. Eudy has gone through extensive rehabilitation. The recovery process has been long and extremely painful.

## MAJOR CHANGES AT WCW

54.

Although Mr. Eudy has remained ready to perform under the Agreement as requested, WCW went through significant changes during the early part of the year 2000. WCW changed its operating management on at least two occasions in 2000.

55.

There were numerous press reports that WCW's parent corporation, Time Warner, Inc., embarked on a program of reducing or eliminating WCW's contractual obligations, as a prelude to Time-Warner's merger with America Online, Inc.

-11-

56.

During his wrestling tenure with Defendants, Mr. Eudy received paychecks issued by
Defendant Turner Sports Inc. that showed WCW as an affiliated entity.

57.

Mr. Eudy received correspondence from WCW on stationary letterhead which
specifically represented that WCW was a division of Turner Sports, stating, "World
Championship Wrestling [,] A Division of Turner Sports."

58.

Defendants Turner Sports, Inc. and WCW shared the same business address, One CNN
Center, Atlanta, Georgia.

59.

Defendants Turner Sports, Inc. and Turner Entertainment Group, Inc. dominated and
controlled the business activities of WCW.

60.

Defendants Turner Sports, Inc. and Turner Entertainment Group, Inc.'s executives
managed and operated the business of WCW and paid wrestlers' salaries.

61.

Defendant Turner Sports, Inc. and Defendant Turner Sports Entertainment Group, Inc.
had their employees direct the activities of WCW.

62.

WCW, as a division of Turner Sports and/or Turner Entertainment, acted as Defendant
Turner Sports, Inc. and/or Turner Entertainment Group, Inc.'s agent in connection with operation

-12-

of the business. As such, Defendants Turner Sports, Inc. and Turner Entertainment Group, Inc. are vicariously liable for the conduct of WCW.

63.

Defendants Turner Sports, Inc., Turner Entertainment Group, Inc. and WCW acted as joint venturers in the business operations of WCW as a wrestling enterprise.

64.

WCW was the alter ego of Defendants Turner Sports, Inc. and Turner Entertainment Group, Inc. Defendants Turner Sports, Inc. and Turner Entertainment Group, Inc. have commingled their assets with those of WCW, have controlled the business of WCW to advance and further their own business purposes, and have abused and disregarded the corporate form and, therefore, the corporate veil should be pierced.

65.

Recently, Defendant Turner Entertainment Group, Inc. and/or AOL Time Warner sold WCW to World Wrestling Federation Entertainment, Inc. ("WWF"). In this transaction, certain assets were sold to WWF, including but not limited to the right to use the name "WCW". However, the contracts of certain wrestlers were not similarly transferred. WWF uses the name "WCW" but not its employees, equipment, etc.

66.

WCW now does not perform shows but has changed its name to Universal Wrestling Company, Inc., a Georgia corporation. Upon information and belief, this corporation merely exists for the benefit of the remaining liabilities of WCW.

## COUNT ONE

### BREACH OF CONTRACT

67.

Mr. Eudy adopts, re-alleges and incorporates herein and above by reference all allegations contained in Paragraphs 1 through 66 of the Amended Complaint fully and completely as if set forth herein

68.

Mr. Eudy had entered into various oral, written, express and implied agreements with Defendants, including but not limited to, oral promise to pay Mr. Eudy for a PPV event in April, 2000 and the Agreement.

69.

Defendants breached the terms of the Agreement, by among other things, improperly reducing Mr. Eudy's pay, failing to pay Mr. Eudy, reducing Mr. Eudy's pay when he was still performing for Defendants benefit, and terminating his Agreement.

70.

Mr. Eudy's contract provided that "Wrestler shall be paid for a minimum of eight (8) Pay Per View events per contractual year." This guaranteed compensation is in addition to Mr. Eudy's regular salary. Mr. Eudy was only paid in full for two PPV's during Year Two of his Agreement. He was paid one-half of his PPV guaranteed compensation of $137,500. Thus, Defendants admit owing Mr. Eudy this guaranteed compensation. Defendants have breached their agreement by failing to pay this amount for Year Two, which is $135,500.

71.

Defendants, by and through Mr. Eric Bischoff and Mr. Vince Russo, and Mr. Eudy agreed that Mr. Eudy would be paid $50,000 for an extra PPV Event that Mr. Eudy would not have to appear at. This agreement was further ratified by Ms. Diana Meyers.

72.

Mr. Eudy was not paid anything in Year Three of his Agreement because the Agreement was unlawfully and improperly terminated by Defendants. Defendants have breached their agreement by failing to pay this $1,380,000 in compensation.

73.

Defendants improperly and in breach of the Agreement with Mr. Eudy reduced his pay during Year Two of his Agreement.

74.

By all of these acts, Defendants breached their duties of good faith and fair dealing.

75.

As a direct and proximate result of Defendants' acts, Mr. Eudy has suffered harm, including the loss of his pay under the Agreement, loss of endorsements, and status as a performer.

76.

Mr. Eudy is entitled to damages for the breaches of the agreements, including but not limited to payment for the other half of his guaranteed PPV events for 2000/2001 at $135,500 per event, the full value of remainder of the Agreement from June 1, 2001 until July 1, 2002, (Year Three - $1,380,000.) repayment of improperly reduced salary during the term of his agreement, payment for the $50,000 PPV promised by Mr. Bischoff, Mr. Russo and Ms. Meyers

-15-

as officer and employees of WCW and Defendants, and such other damages resulting from Defendants' breaches.

## COUNT TWO

## BREACH OF FIDUCIARY DUTY

### 77.

Mr. Eudy adopts, re-alleges and incorporates herein and above by reference all allegations contained in Paragraphs 1 through 76 of the Amended Complaint fully and completely as if set forth herein

### 78.

Mr. Eudy was an independent contractor for Defendants and provided skills and services for which Defendants received financial benefits. Mr. Eudy was convinced to perform acts which were injurious and dangerous to him for the benefit of the company and to drive up ratings.

### 79.

Mr. Eudy performed acts for the benefit of Defendants at Defendants' insistence, including, but not limited to, making appearances, performing while injured and other acts.

### 80.

At Defendants' insistence and for the expressed benefit of Defendants, Mr. Eudy performed a leap from the top ropes of the ring resulting in both of the bones in his leg being broken.

### 81.

When Mr. Eudy was severely injured on the PPV as a result of Defendants' acts, Defendants improperly and in bad faith reduced Mr. Eudy's pay and then terminated his contract.

-16-

82.

Defendants capitalized on the nature and severity of Mr. Eudy's injuries, incurred as a result of Defendants' misconduct, and replayed the incident of live television repeatedly, used it as a focal point for the following weeks' show by having Mr. Eudy's physician's show x rays of Mr. Eudy's leg, describing the nature and extent of the injury and the surgery necessary for such injury and otherwise advertising and promoting the injury. This promotion resulted in higher ratings and income for Defendants. Defendants retained the benefits of this incident even though Defendants had cut Mr. Eudy's pay and then terminated his contract shortly thereafter.

83.

As Mr. Eudy's contractor, employer, performance league and/or as the prime beneficiary of Mr. Eudy's labors, Defendants owed duties to Mr. Eudy, including fiduciary duties, duties of good faith and fair dealing.

84.

As a result of Defendants' misconduct, Mr. Eudy has suffered damages, including but not limited to the loss of his Agreement with Defendants, the loss of income associated with his performance, the loss of future revenue from his performances and other damages.

85.

Defendants' conduct was grossly intentional, negligent, reckless, willful, wanton, malicious, oppressive, and/or unmindful of their duty and obligations to Plaintiffs and/or exhibited that entire want of care which would raise the presumption of conscious indifference to consequences so as to warrant the imposition of punitive damages in an amount sufficient to punish, penalize, and/or deter Defendants from similar conduct in the future.

## COUNT THREE

### UNJUST ENRICHMENT

86.

Mr. Eudy adopts, re-alleges and incorporates herein and above by reference all allegations contained in Paragraphs 1 through 85 of the Amended Complaint fully and completely as if set forth herein.

87.

Defendants had an insurance policy(ies) covering Mr. Eudy.

88.

Upon information and belief, this policy(ies) covered the full value of Mr. Eudy's Agreement.

89.

Defendants capitalized on the nature and severity of Mr. Eudy's injuries, incurred as a result of Defendants' misconduct, and replayed the incident on live television repeatedly, used it as a focal point for the following shows by having Mr. Eudy's physician's show x rays of Mr. Eudy's leg, describing the nature and extent of the injury and the surgery necessary for such injury and otherwise advertising and promoting the injury. This promotion resulted in higher ratings and income for Defendants. Defendants retained the benefits of this incident even though Defendants had cut Mr. Eudy's pay and then terminated his shortly thereafter.

90.

Upon Mr. Eudy's injury, which was caused by the misconduct of Defendants, Defendants retained the proceeds of the insurance policy and profited from the higher ratings from the severity of Mr. Eudy's injury and were, thereby, unjust enriched.

91.

The ill gotten proceeds, including but not limited to the insurance proceeds, and the proceeds from the raised ratings, should be disgorged and given to Mr. Eudy.

## COUNT FOUR

### NEGLIGENCE

92.

Mr. Eudy adopts, re-alleges and incorporates herein and above by reference all allegations contained in Paragraphs 1 through 91 of the Amended Complaint fully and completely as if set forth herein.

93.

As Mr. Eudy's contractor, employer, performance league and/or as the prime beneficiary of Mr. Eudy's labors, Defendants owed duties to Mr. Eudy.

94.

Defendants breached their duty to Mr. Eudy by insisting that he perform while he was injured, and perform a move from the top rope, which resulted in serious and permanent damage to Mr. Eudy.

95.

As a result of Defendants' misconduct, Mr. Eudy has suffered damages, including but not limited to the loss of his Agreement with Defendants, the loss of income associated with his performance, the loss of future revenue from his performances and other damages.

96.

Defendants' conduct was grossly intentional, negligent, reckless, willful, wanton, malicious, oppressive, and/or unmindful of their duty and obligations to Plaintiffs and/or

-19-

exhibited that entire want of care which would raise the presumption of conscious indifference to consequences so as to warrant the imposition of punitive damages in an amount sufficient to punish, penalize, and/or deter Defendants from similar conduct in the future.

## COUNT FIVE

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### 97.

Mr. Eudy adopts, re-alleges and incorporates herein above and by reference all allegations contained in Paragraphs 1 through 96 of the Amended Complaint fully and completely as if set forth herein.

### 98.

By insisting that Mr. Eudy perform a wrestling move that required him to leap from the top rope, Mr. Laurinaitis forced Mr. Eudy to suffer a physical impact, which resulted in a physical harm to Mr. Eudy.

### 99.

Mr. Eudy's physical injury has caused him much mental suffering and emotional distress, for which he is entitled to recover in an amount to be determined at trial.

### 100.

Defendants' conduct was grossly intentional, negligent, reckless, willful, wanton, malicious, oppressive, and/or unmindful of their duty and obligations to Plaintiffs and/or exhibited that entire want of care which would raise the presumption of conscious indifference to consequences so as to warrant the imposition of punitive damages in an amount sufficient to punish, penalize, and/or deter Defendants from similar conduct in the future.

-20-

## COUNT SIX

## NEGLIGENT RETENTION

### 101.

Mr. Eudy adopts, re-alleges and incorporates herein above and by reference all allegations contained in Paragraphs 1 through 100 of the Amended Complaint fully and completely as if set forth herein.

### 102.

UWC, TSI, and TEG knew or should have known of Mr. Laurinaitis' propensity to engage in the conduct which resulted in Mr. Eudy's injury.

### 103.

UWC, TSI, and TEG breached their duty to Mr. Eudy by retaining Mr. Laurinaitis as an employee while knowing he had the propensity to engage in the conduct which resulted in Mr. Eudy's injury.

### 104.

UWC, TSI, and TEG's breach caused damage to Mr. Eudy in an amount to be determined at trial.

### 105.

Defendants' conduct was grossly intentional, negligent, reckless, willful, wanton, malicious, oppressive, and/or unmindful of their duty and obligations to Plaintiffs and/or exhibited that entire want of care which would raise the presumption of conscious indifference to consequences so as to warrant the imposition of punitive damages in an amount sufficient to punish, penalize, and/or deter Defendants from similar conduct in the future.

## COUNT SEVEN

## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

### 106.

Mr. Eudy adopts, re-alleges and incorporates herein above and by reference all allegations contained in Paragraphs 1 through 105 of the Amended Complaint fully and completely as if set forth herein.

### 107.

Mr. Eudy and WCW had a valid contract for wrestling services.

### 108.

Mr. Laurinaitis was not a party to the contract between Mr. Eudy and WCW.

### 109.

Mr. Laurinaitis acted intentionally, and without privilege or justification when he induced Mr. Eudy to engage in conduct resulting in his inability to continue business relations with WCW.

### 110.

As a result of Mr. Laurinaitis' misconduct, Mr. Eudy has suffered damages, including but not limited to the loss of his Agreement with Defendants, the loss of income associated with his performance, the loss of future revenue from his performances and other damages.

### 111.

Defendants' conduct was grossly intentional, negligent, reckless, willful, wanton, malicious, oppressive, and/or unmindful of their duty and obligations to Plaintiffs and/or exhibited that entire want of care which would raise the presumption of conscious indifference to

-22-

consequences so as to warrant the imposition of punitive damages in an amount sufficient to punish, penalize, and/or deter Defendants from similar conduct in the future.

## COUNT EIGHT

## ATTORNEYS' FEES

### 112.

Mr. Eudy adopts, re-allege and incorporate herein and above by reference all allegations contained in Paragraphs 1 through 111 of the Amended Complaint fully and completely as if set forth herein.

### 113.

Defendants have acted in bad faith, been stubbornly litigious, and have caused Mr. Eudy unnecessary trouble and expense.

### 114.

Pursuant to O.C.G.A. § 13-6-11, Mr. Eudy is entitled to recovery of expenses of litigation and attorneys' fees.

### 115.

Mr. Eudy therefore requests reasonable attorneys' fees, costs and other expenses of litigation, and any other damages within the discretion of this Court to grant.

WHEREFORE, Mr. Eudy respectfully requests that the Court grant him judgment against Defendants as follows:

a.    That process be issued and served as provided by law requiring Defendants to appear and answer and face judgment;

-23-

b.   That as to Count I, Mr. Eudy receive judgment in an amount to be determined at trial by the finder of fact against Defendants, jointly and severally, for general, special, actual, and compensatory damages;

c.   That as to Count II, Mr. Eudy receive judgment in an amount to be determined at trial by the finder of fact against Defendants, jointly and severally, for general, special, actual, compensatory and punitive damages;

d.   That as to Count III, Mr. Eudy receive judgment in an amount to be determined at trial by the finder of fact against Defendants, jointly and severally;

e.   That as to Count IV, Mr. Eudy receive judgment in an amount to be determined at trial by the finder of fact against Defendants, jointly and severally, for general, special, actual, and compensatory damages;

f.   That as to Count V, Mr. Eudy receive judgment in an amount to be determined at trial by the finder of fact against Defendants, jointly and severally, for general, special, actual, and compensatory damages;

g.   That as to Count VI, Mr. Eudy receive judgment in an amount to be determined at trial by the finder of fact against Defendants, jointly and severally, for general, special, actual, and compensatory damages;

h.   That as to Count VII, Mr. Eudy receive judgment in an amount to be determined at trial by the finder of fact against Defendants, jointly and severally, for general, special, actual, and compensatory damages;

i.   Mr. Eudy recover the costs associated with this litigation including, but not limited to, attorneys' fees;

j.      That as to Counts II that there be no limitation of punitive damages or treble damages

pursuant to O.C.G.A. § 51-12-5.1(f)

k.      That the Court award pretrial and post trial interest on any amounts found to be owed

to Mr. Eudy; and,

l.      That the Court grant such other and further relief as it deems just and proper.

Respectfully submitted this 5th day of February, 2003.

COUNSEL FOR PLAINTIFF
MR. SIDNEY R. EUDY

By: _____
STEPHEN G. WEIZENECKER
Georgia Bar No. 746451
KIM KNIGHT PEREZ
Georgia Bar No. 572125
ROXANA DEHNAD
Georgia Bar No. 216268

WEIZENECKER, ROSE,
MOTTERN & FISHER, PC
1800 Peachtree Street, NW, Suite 620
Atlanta, Georgia 30309
(404) 365-9799

-25-

**TIG INSURANCE** ℠

ED BY THE INSURANCE COMPANY
ATED BY AN "X"

X   Insurance Company
Administrative Office, Irving, Texas 75039

Policy No.  T7 0003796479902
Replacement No.  T7 0003796479901

**Common Policy - Declarations**

**NAMED INSURED AND ADDRESS:**
WORLD CHAMPIONSHIP WRESTLING, INC.
(SEE IL1201-01)
PO BOX 105366
ATLANTA, GA 30348

**POLICY PERIOD:** From         04/01/00                  to    04/01/01
at 12:01 a.m. Standard Time at your mailing address shown above.

**BUSINESS DESCRIPTION:**    PROFESSIONAL WRESTLING

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the
insurance as stated in this policy.

This policy consists of the following coverage parts and separate policies for which a premium is indicated.

This premium may be subject to adjustment.

| | PREMIUM |
|---|---|
| Commercial Property Coverage Part........................... | |
| Commercial General Liability Coverage Part ............. | $    106,650 |
| Commercial Inland Marine Coverage Part................. | |
| Commercial Crime Coverage Part............................. | |
| Commercial Auto Coverage Part............................... | |
| Umbrella Policy......................................................... | |
| Employee Benefits Coverage Part ........................... | $    2,311 |
| Ocean Marine Coverage Part.................................... | |
| Non-Owned/Hired Auto Coverage Part ..................... | |
| Liquor Liability Coverage Part.................................. | $    500 |
| Stop Gap Liability Coverage Part ............................. | $    1,152 |
| Owners & Contractors Protective Coverage Part ....... | |

THE UNDERSIGNED CERTIFIES THAT THIS
PHOTOCOPY WITH THE ENDORSEMENTS
ATTACHED IS A TRUE AND CORRECT COPY
OF THE POLICY.

Minimum Premium          SEE IL1201

TOTAL PREMIUM        $    110,613

SIGNATURE                    5-16-03        DATE

**FORMS APPLICABLE TO ALL COVERAGE PARTS:**    ZC18558D(04/99)        IL0017(11/98)

**COUNTERSIGNED**          04/01/00          **by:**

                DATE                                      **AUTHORIZED REPRESENTATIVE**



EXHIBIT
D

ZC 17334 A                                                                                            10-94

Policy Change
Number 0002

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

IL 12 01 11 85

POLICY CHANGES

| POLICY NO. | POLICY CHANGES EFFECTIVE | COMPANY |
|---|---|---|
| T7 0003796479902 | 01/12/01 | TIG INSURANCE COMPANY |

| NAMED INSURED | AUTHORIZED REPRESENTATIVE |
|---|---|
| WORLD CHAMPIONSHIP WRESTLING, INC. | K&K INSURANCE AGENCY,INC. |

| COVERAGE PARTS AFFECTED | PAGE 01 OF 01 |
|---|---|
| All Coverage Parts | |

CHANGES

(X) Insured's Name                  ( ) Insured's Mailing Address
( ) Business of the Insured         ( ) Entity
( ) Policy Expiration Date          ( ) Insured Locations

is/are changed to read:

ADDING THE FOLLOWING AS A NAMED INSURED:

AOL TIME WARNER, INC.

The above amendments result in a change of premium as follows:

(X) No Change      ( ) To be Adjusted     ( ) Additional    ( ) Return
                       at Audit                Premium            Premium
                                               $                  $

KK   02/01/01

_Catherine Bohy_
Authorized Representative Signature

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

IL 12 01 11 85

POLICY CHANGES

| POLICY NO.<br><br>T7 0003796479902 | POLICY CHANGES<br>EFFECTIVE<br>10/28/00 | COMPANY<br>TIG INSURANCE COMPANY |
|---|---|---|
| NAMED INSURED<br><br>WORLD CHAMPIONSHIP WRESTLING, INC. | | AUTHORIZED REPRESENTATIVE<br><br>K&K INSURANCE AGENCY,INC. |
| COVERAGE PARTS AFFECTED<br><br>Commercial General Liability | | PAGE 01 OF 01 |

CHANGES

Form Number:    CG 2010 "Additonal Insured - Owners, Lessees or
                         Contractors-Scheduled Person or Organization"

(X) Add Form          ( ) Delete Form          ( ) Amend Form To Include
                                                    Additional Insured Below:

RE: MGM GRAND, INC., ITS SUBSIDIARIES, AFFILIATES AND THEIR DIRECTORS
    OFFICERS AND EMPLOYEES

EVENT:   WCW WRESTLING
DATE:    10/28/00 - 10/29/00

The above amendments result in a change of premium as follows:

(X) No Change        ( ) To be Adjusted      ( ) Additional   ( ) Return
                         at Audit                 Premium          Premium
                                                  $                $

KK  10/03/00

_Catherine B Lucy_

Authorized Representative Signature

POLICY NUMBER.  T7 0003796479902

COMMERCIAL GENERAL LIABILITY
CG 20 10 03 97

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED - OWNERS, LESSEES OR CONTRACTORS - SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

**Name of Person or Organization:**
MGM GRAND, INC., ITS SUBSIDIARIES, AFFILIATES AND THEIR DIRECTORS, OFFICERS AND EMPLOYEES

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**Who Is An Insured (Section II)** is amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability arising out of your ongoing operations performed for that insured.

 Copyright, Insurance Services Office, Inc., 1996

 **TIG** INSURANCE℠

ISSUED BY THE INSURANCE COMPANY
INDICATED BY AN "X"

☒ TIG Insurance Company
Administrative Office, Irving, Texas 75039

☐

Policy No.  T7-00037964799-00
Replacement No.

**Common Policy - Declarations**

NAMED INSURED AND ADDRESS:

WORLD CHAMPIONSHIP WRESTLING, INC.
(SEE IL1201-01)
PO BOX 105366
ATLANTA, GA 30348

POLICY PERIOD: From 04/01/98                to  04/01/01
           at 12:01 a.m. Standard Time at your mailing address shown above.

BUSINESS DESCRIPTION:

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

This policy consists of the following coverage parts and separate policies for which a premium is indicated. This premium may be subject to adjustment.

|  | PREMIUM |
|---|---|
| Commercial Property Coverage Part. . . . . . . . . . . |  |
| Commercial General Liability Coverage Part . . . . . . | $319,950.00 |
| Commercial Inland Marine Coverage Part . . . . . . . . |  |
| Commercial Crime Coverage Part . . . . . . . . . . . . |  |
| Commercial Auto Coverage Part . . . . . . . . . . . . . |  |
| Umbrella Policy . . . . . . . . . . . . . . . . . . . . . . . . . |  |
| EMPLOYEE BENEFITS LIABILITY PART | $6,933.00 |
| LIQUOR LIABILITY PART | $1,500.00 |
| STOP GAP LIABILITY PART | $3,456.00 |
|  |  |
|  |  |
| Minimum Premium | SEE IL1201 |
| TOTAL PREMIUM | $331,839.00 |

FORMS APPLICABLE TO ALL COVERAGE PARTS:

ZC18558C 1-98, IL 0017 11-85

COUNTERSIGNED_____          by: _____
                     DATE                              AUTHORIZED REPRESENTATIVE

T7 -00037964799-00

GU 267
(11-85)

IL 00 17 11 85

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. CANCELLATION

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. CHANGES

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. EXAMINATION OF YOUR BOOKS AND RECORDS

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. INSPECTIONS AND SURVEYS

We have the right but are not obligated to:

1. Make inspections and surveys at any time;

2. Give you reports on the conditions we find; and

3. Recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

1. Are safe or healthful; or

2. Comply with laws, regulations, codes or standards.

This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

## E. PREMIUMS

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Copyright, Insurance Services Office, Inc., 1982, 1983


**TIG INSURANCE**ₛₘ

Policy No.   T7 -00037964799-00
Replacement No.

**Commercial General Liability -
Declarations**

**NAMED INSURED AND ADDRESS:**

WORLD CHAMPIONSHIP WRESTLING, INC.
(SEE IL1201-01)
PO BOX 105366
ATLANTA, GA 30348

**FORM OF BUSINESS**
☐ Individual          ☐ Joint Venture
☐ Partnership        ☒ Organization *(other than a
                                      partnership or joint venture)*

**RETROACTIVE DATE:** *(CG 00 02 only)* Coverage A of this insurance does not apply to "bodily injury" or "property damage" which occurs before the following Retroactive Date(if any):

**LIMITS OF INSURANCE**

| | |
|---|---|
| General Aggregate Limit (other than products - completed operations) | NONE |
| Products - Completed Operations Aggregate Limit | $1,000,000.00 |
| Personal and Advertising Injury Limit | $1,000,000.00 |
| Each Occurrence Limit | $1,000,000.00 |
| Fire Damage Limit | $1,000,000.00 any one fire |
| Medical Expense Limit | $5,000.00 any one person |

**LOCATION OF ALL PREMISES YOU OWN, RENT OR OCCUPY:**

VARIOUS LOCATIONS

**PREMIUM**
Advance Premium for this Coverage Part is _____ $319,950.00

**ENDORSEMENTS ATTACHED TO THIS COVERAGE PART:**

S 17486CG 11-94, IL 1201-01 11-85, CG 0001 1-96, S 322CG 10-97, IL 0021 11-94, LB 17380 2-86,
CG 2147 10-93, S 134CG 11-90, S 138CG 7-89, S 277CG 4-89, S 157CG 10-89, CG 2026 11-85,
S 342CG 5-91, S 343CG 7-93, CG 0212 11-85, IL 0262 12-95

# LIABILITY SCHEDULE AND PREMIUM RECAP

**POLICY NUMBER:**   T7 -00037964799-00

| LOC. NO. | * DESCRIPTION SUBLINE - CLASS CODE | *PREMIUM BASE ACT. EXPOSURE | RATES | PREMIUMS |
|---|---|---|---|---|
| | 347/40069 ATHLETIC TEAMS - PROFESSIONAL OR SEMI-PROFESSIONAL | (E) | .36 | $313,200.00 |
| | FIRE LEGAL LIABILITY INCREASED LIMITS | FLAT | FLAT | $6,750.00 |
| | THIS POLICY IS NOT SUBJECT TO AN AUDIT. | | | |
| | | | **TOTAL PREMIUMS** | $319,950.00 |

*SUBLINE KEY
332  -  Liquor Liability
334  -  Premises/Operations
335  -  Owners/Contractors Protective or
         Principals Protective
336  -  Products/Completed Operations
350  -  Pollution Liability
345  -  Other Composite Rated/Premises/Operations ONLY
346  -  Other Composite Rated/Product/Completed
         Operations ONLY
347  -  Other Composite Rated - BOTH Premises/Operations
         AND Product/Completed Operations or type in subline

*PREMIUM/EXPOSURE BASE KEY
A  -  Area (per 1,000 square feet)
C  -  Total Cost (per $1,000)
E  -  Admissions (per head)
M  -  Admissions (per 1,000)
P  -  Payroll (per $1,000)
R  -  Receipts (per $100)
S  -  Gross Sales (per $1,000)
U  -  Units (per unit) or type in base

Policy Change
Number  01

GU  269
(11-85)

**THE ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

IL 12 01 11 85

# POLICY CHANGES

| POLICY NO. | POLICY CHANGES EFFECTIVE | COMPANY |
|---|---|---|
| T7 -00037964799-00 | 04/01/98 - 04/01/99 | TIG INSURANCE COMPANY |

| NAMED INSURED | AUTHORIZED REPRESENTATIVE |
|---|---|
| WORLD CHAMPIONSHIP WRESTLING, INC. | K&K INSURANCE AGENCY, INC. |

**COVERAGE PARTS AFFECTED**

ALL COVERAGE PARTS

**CHANGES**

IT IS AGREED AND UNDERSTOOD THAT THE POLICY PREMIUM WILL BE BILLED
ACCORDING TO THE FOLLOWING INSTALLMENTS:

FIRST YEAR POLICY PREMIUM:

| INSTALLMENT DATE | AMOUNT |
|---|---|
| 04/01/98 | $27,653.25 |
| 07/01/98 | $27,653.25 |
| 10/01/98 | $27,653.25 |
| 01/01/99 | $27,653.25 |

SECOND YEAR POLICY PREMIUM:

| INSTALLMENT DATE | AMOUNT |
|---|---|
| 04/01/99 | $27,653.25 |
| 07/01/99 | $27,653.25 |
| 10/01/99 | $27,653.25 |
| 01/01/00 | $27,653.25 |

CONTINUED...

Authorized Representative Signature

Copyright Insurance Services Office, Inc., 1983
Copyright ISO Commercial Risk Services, Inc 1983

Policy Change
Number ___01___

GU  269
(11-85)

## THE ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

IL 12 01 11 85

# POLICY CHANGES

| POLICY NO. | POLICY CHANGES EFFECTIVE | COMPANY |
|---|---|---|
| T7 -00037964799-00 | 04/01/98 - 04/01/99 | TIG INSURANCE COMPANY |

| NAMED INSURED | AUTHORIZED REPRESENTATIVE |
|---|---|
| WORLD CHAMPIONSHIP WRESTLING, INC. | K&K INSURANCE AGENCY, INC. |

**COVERAGE PARTS AFFECTED**

ALL COVERAGE PARTS

### CHANGES

CONTINUED...

THIRD YEAR POLICY PREMIUM:

| INSTALLMENT DATE | AMOUNT |
|---|---|
| 04/01/00 | $27,653.25 |
| 07/01/00 | $27,653.25 |
| 10/01/00 | $27,653.25 |
| 01/01/01 | $27,653.25 |

Authorized Representative Signature

Copyright Insurance Services Office, Inc., 1983
Copyright, ISO Commercial Risk Services, Inc.1983

T7 -00037964799-00

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under WHO IS AN INSURED (SECTION II).

Other words and phrases that appear in quotation marks have special meaning. Refer to DEFINITIONS (SECTION V).

## SECTION I - COVERAGES

## COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

      (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS - COVERAGES A AND B.

   b. This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

      (2) The "bodily injury" or "property damage" occurs during the policy period.

   c. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

2. **Exclusions**

   This insurance does not apply to:

   a. **Expected or Intended Injury**

      "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

   b. **Contractual Liability**

      "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

      (1) That the insured would have in the absence of the contract or agreement; or

      (2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

         (a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

Subparagraphs **(a)** and **(d) (I)** do not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a hostile fire.

As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**g.  Aircraft, Auto or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured.    Use includes operation and "loading or unloading".

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft;  or

**(5)** "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h.  Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured;  or

**(2)** The use of "mobile equipment" in, or while in practice or preparation for, a prearranged racing, speed or demolition contest or in any stunting activity.

**i.  War**

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war.  War includes civil war, insurrection, rebellion or revolution.  This exclusion applies only to liability assumed under a contract or agreement.

**j.  Damage to Property**

"Property damage" to:

**(1)** Property you own, rent or occupy;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations;  or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraph **(2)** of this exclusion does not apply If the premises are "your work" and were never occupied, rented or held for rental by you.

(2) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

(3) Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured;

(4) For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement;  or

(5) Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

b. "Advertising injury" arising out of:

(1) Breach of contract, other than misappropriation of advertising ideas under an implied contract;

(2) The failure of goods, products or services to conform with advertised quality or performance;

(3) The wrong description of the price of goods, products or services; or

(4) An offense committed by an insured whose business is advertising, broadcasting, publishing or telecasting.

c. Any loss, cost or expense arising out of any:

(1) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants;  or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed.

## COVERAGE C. MEDICAL PAYMENTS

1. **Insuring Agreement**

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(1) The accident takes place in the "coverage territory" and during the policy period;

(2) The expenses are incurred and reported to us within one year of the date of the accident; and

(3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance.  We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices;  and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

2. **Exclusions**

We will not pay expenses for "bodily injury":

a. To any insured.

b. To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c. To a person injured on that part of premises you own or rent that the person normally occupies.

d. To a person, whether or not an employee of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

Our obligation to defend an insured's indemnitee and to pay for attorneys fees and necessary litigation expenses as Supplementary Payments ends when:

**a.** We have used up the applicable limit of insurance in the payment of judgments or settlements; or

**b.** The conditions set forth above, or the terms of the agreement described in paragraph **f.** above.

## SECTION II - WHO IS AN INSURED

1. If you are designated in the Declarations as:

    **a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

    **b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

    **c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

    **d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

2. Each of the following is also an insured:

    **a.** Your "employees", other than your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" is an insured for:

        (1) "Bodily injury" or "personal injury":

            (a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while that co-"employee" is either in the course of his or her employment or performing duties related to the conduct of your business;

            (b) To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of paragraph **(1)(a)** above;

            (c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in paragraphs **(1)(a)** or **(b)** above; or

            (d) Arising out of his or her providing or failing to provide professional health care services.

        (2) "Property damage" to property:

            (a) Owned, occupied or used by,

            (b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

        you, any of your "employees", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

    **b.** Any person (other than your "employee"), or any organization while acting as your real estate manager.

    **c.** Any person or organization having proper temporary custody of your property if you die, but only:

        (1) With respect to liability arising out of the maintenance or use of that property; and

        (2) Until your legal representative has been appointed.

    **d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

   Copyright, Insurance Services Office, Inc., 1994

# SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS

## 1. Bankruptcy

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

## 2. Duties In The Event of Occurrence, Offense, Claim Or Suit

a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

   (1) How, when and where the "occurrence" or offense took place;

   (2) The names and addresses of any injured persons and witnesses;  and

   (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

b. If a claim is made or "suit" is brought against any insured, you must:

   (1) Immediately record the specifics of the claim or "suit" and the date received;  and

   (2) Notify us as soon as practicable.

   You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c. You and any other involved insured must:

   (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

   (2) Authorize us to obtain records and other information;

   (3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit";  and

   (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d. No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

## 3. Legal Action Against Us

No person or organization has a right under this Coverage Part:

a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured;  or

b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

## 4. Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under Coverage A or B of this Coverage Part, our obligations are limited as follows:

a. **Primary Insurance**

   This insurance is primary except when **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **c.** below.

b. **Excess Insurance**

   This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:

   (1) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

   (2) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;  or

   (3) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Coverage A (Section I).

**b.** Oral or written publication of material that violates a person's right of privacy;

**c.** Misappropriation of advertising ideas or style of doing business; or

**d.** Infringement of copyright, title or slogan.

**2.** "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, provided the injury or damage does not occur in the course of travel or transportation to or from any place not included in **a.** above; or

**c.** All parts of the world if:

**(1)** The injury or damage arises out of:

**(a)** Goods or products made or sold by you in the territory described in **a.** above; or

**(b)** The activities of a person whose home is in the territory described in **a.** above, but is away for a short time on your business; and

**(2)** The insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**6.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

**7.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous;  or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

**a.** The repair, replacement, adjustment or removal of "your product" or "your work";  or

**b.** Your fulfilling the terms of the contract or agreement.

**8.** "Insured contract" means:

**a.** A contract for a lease of premises.  However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner if not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies any person or organization "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications;  or

**e.** Oral or written publication of material that violates a person's right of privacy.

**14.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment or abandoned or unused materials;

(3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

**15.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the "occurrence" that caused it.

**16.** "Suit" means a civil proceeding in which damage because of "bodily injury", "property damage", "personal injury" or "advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**17.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**18.** "Your product" means:

**a.** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(1) You;

(2) Others trading under your name; or

(3) A person or organization whose business or assets you have acquired; and

**b.** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your product" includes:

**a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**b.** The providing of or failure to provide warnings or instructions.

**POLICY NUMBER:**   T7 -00037964799-00                                      COMMERCIAL GENERAL LIABILITY

## THIS ENDORSEMENT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.

## COMMERCIAL GENERAL LIABILITY BROADENED COVERAGE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
COMMON POLICY CONDITIONS  (IL 00 17)

**1.  ADDITIONAL INSUREDS - BY CONTRACT, PERMIT OR AGREEMENT**

    **a.**  SECTION II - WHO IS AN INSURED - is amended to include as an insured any person or organization with whom you have a contract, permit or agreement to provide such insurance as is afforded by this policy but only with respect to liability arising out of:

        **(1)**  "Your work" for the additional insured(s) at the locations designated in the contract;

        **(2)**  Premises or facilities owned by you and not otherwise excluded from this contract.

    **b.**  Provision **a.**, does not apply unless the written contract, agreement or permit has been executed or agreed to prior to the "bodily injury", "property damage", "personal injury" or "advertising injury".

    **c.**  Provision **a.** does not apply to the rendering or failure to render any professional services.

**2.  ADDITIONAL INSURED - LESSOR OF LEASED EQUIPMENT**

SECTION II - WHO IS AN INSURED - is amended to include as an insured any person who is the lessor of equipment leased to you, but only with respect to their liability arising out of the maintenance, operation or use by you of such equipment, subject to the following additional exclusions:

This insurance does not apply to:

1.  Any "occurrence" which takes place after the equipment lease expires;  or

2.  "Bodily injury" or "property damage" arising out of the sole negligence of that person or organization.

**3.  ADDITIONAL INSURED - VENDORS**

SECTION II - WHO IS AN INSURED - is amended to include as an insured any person or organization with whom you have agreed, because of a written contract or agreement to provide insurance, but only with respect to "bodily injury" or "property damage" arising out of "your products" which are distributed or sold in the regular course of the vendor's business, subject to the following additional exclusions:

1.  The insurance afforded the vendor does not apply to:

    **a.**  "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement.  This exclusion does not apply to liability for damages that the vendor would have in the absence of the contract or agreement;

    **b.**  Any express warranty unauthorized by you;

    **c.**  Any physical or chemical change in the product made intentionally by the vendor;

    **d.**  Repacking, unless unpacked solely for the purpose of inspection, demonstration, testing or the substitution of parts under the instruction of the manufacturer, and then repackaged in the original container;

    **e.**  Demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in conjunction with the sale of the product;

    **f.**  Products which, after distribution or sale by you have been labeled or relabeled, or used as a container, part or ingredient of any other thing or substance by or for the vendor.

S-322  CG                                                                                          10-97

## 9. DEFINITION OF BODILY INJURY

SECTION V - DEFINITIONS, paragraph **3.** is deleted and replaced by the following:

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person. This includes mental anguish, mental injury, shock, fright, humiliation, emotional distress or death resulting from bodily injury, sickness or disease.

## 10. UNINTENTIONAL ERRORS AND OMISSIONS

SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS is amended to include the following:

Any unintentional error or omission in the description of or failure to completely describe, any premises or operations intended to be covered by the Coverage Part will not invalidate or affect coverage for those premises or operations.

## 11. KNOWLEDGE OR NOTICE OF OCCURRENCE

SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS, Paragraph **2.**, Duties In The Event Of Occurrence, Claim Or Suit is amended to include the following:

Knowledge of "occurrence", claim or "suit" by the agent, servant or "employee" of an insured shall not in itself constitute your knowledge unless one of your officers, managers or partners has received notice of the "occurrence", claim or "suit".

Failure by an agent, servant or "employee" of an insured (other than an officer, manager or partner) to notify us of an "occurrence" will not be constituted as a failure to comply with paragraphs **a.** and **b.** of this condition.

## 12. ADVERTISING INJURY REDEFINED

SECTION V - DEFINITIONS, Paragraph **1.** is deleted and replaced with the following:

**1.** "Advertising injury" means injury arising out of one or more of the following offenses:

**a.** Any publication of material including, but not limited to oral, written, televised, videotaped or electronically transmitted publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**b.** Any publication of material including, but not limited to oral, written, televised, videotaped or electronically transmitted publication of material that violates a person's right of privacy;

**c.** Misappropriation of advertising ideas or style of doing business;  or

**d.** Infringement of copyright, title or slogan.

COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY. Paragraph **2.a.(1)** and **2.a.(2)** are deleted and replaced with the following

**a.** **(1)** Arising out of publication of material including, but not limited to oral, written, televised, videotaped or electronically transmitted publication of material, if done by or at the direction of the insured with knowledge of its falsity;

**(2)** Arising out of publication of material including, but not limited to oral, written, televised, videotaped or electronically transmitted publication of material whose first publication took place before the beginning of the policy period.

## 13. PERSONAL INJURY

SECTION V - DEFINITIONS "Personal Injury"; item **b.**, is deleted and replaced with the following:

**b.** Malicious prosecution or abuse of process;

## 14. NOTICE OF CANCELLATION

COMMON POLICY CONDITIONS, SECTION A Cancellation, item **2.b.** is deleted and replaced with the following:

**b.** 60 days before the effective date of cancellation if we cancel for any other reason.

S-322 CG                                                                                                                    10-97

T7 -00037964799-00

IL 00 21 11 94

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS POLICY
COMMERCIAL AUTO COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY NEW YORK DEPARTMENT OF
   TRANSPORTATION
UNDERGROUND STORAGE TANK POLICY

1. The insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage":

      (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from the "hazardous properties" of "nuclear material", if:

      (1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

      (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

2. As used in this endorsement:

   "Hazardous properties" include radioactive, toxic or explosive properties.

   "Nuclear material" means "source material", "Special nuclear material" or "by-product material".

   "Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

   "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

Copyright, Insurance Services Office, Inc., 1994

T7 -00037964799-00

## Exclusion - Asbestos Products

*This endorsement modifies changes the policy.  Please read it carefully.*

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

This insurance does not apply to:

1.   "Bodily injury" resulting from exposure to asbestos or any product containing asbestos;

2.   "Property damage" resulting from the handling, processing, manufacturing, installing, removing, disposal, sale or distribution of asbestos or any product containing asbestos; or

3.   Any loss, cost or expense arising out of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing asbestos or any product containing asbestos,  whether done pursuant to government directive or request, or for any other reason.

T7 -00037964799-00

CL 701
(10-93)

## THIS ENDORSEMENT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.

CG 21 47 10 93

## EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to paragraph **2.**, Exclusions of COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I - Coverages):

This insurance does not apply to:

"Bodily injury" to:

(1) A person arising out of any:

   (a) Refusal to employ that person;

   (b) Termination of that person's  employment;  or

   (c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person;  or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in paragraphs **(a)**, **(b)** or **(c)** above is directed.

This exclusion applies:

(1) Whether the insured may be held liable as an employer or in any other capacity;  and

(2) To any obligation to share damages with or to repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to paragraph **2.**, Exclusions of COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY (Section I - Coverages):

This insurance does not apply to:

"Personal injury" to:

(1) A person arising out of any:

   (a) Refusal to employ that person;

   (b) Termination of that person's  employment;  or

   (c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person;  or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "personal injury" to that person at whom any of the employment-related practices described in paragraphs **(a)**, **(b)** or **(c)** above is directed.

This exclusion applies:

(1) Whether the insured may be held liable as an employer or in any other capacity;  and

(2) To any obligation to share damages with or to repay someone else who must pay damages because of the injury.

Copyright, Insurance Services Office, Inc., 1992

**POLICY NUMBER:**   T7 -00037964799-00                    **COMMERCIAL GENERAL LIABILITY**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AIRPORT/AIRCRAFT/HOT AIR BALLOON EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

This insurance does not apply to any liability arising from the use or operation of any Aircraft, Hang Glider, Parachute, Hot Air Balloon, Airfield or Airport facility, including any duty to defend with respect to any claims or suits for damages arising out of the operations, maintenance, use, leasing, hiring, renting, borrowing, lending, loading or unloading of an Aircraft, Hang Glider, Parachute or Hot Air Balloon whether owned by you or others, unless specifically endorsed hereon.

**POLICY NUMBER:**    T7 -00037964799-00                    **COMMERCIAL GENERAL LIABILITY**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## FIREWORKS EXCLUSION

This endorsement modifies insurance provided under the following:

  COMMERCIAL GENERAL LIABILITY COVERAGE PART


This insurance does not apply to any Bodily Injury or Property Damage caused, directly or indirectly, by fireworks, pyrotechnics or any similar explosive material, but only with respect to fireworks used by or at the direction of the Insured unless specifically endorsed hereon.  EXCEPTION:  For the purpose of this endorsement, Flashboxes shall not be considered fireworks.  Flashboxes are devices used to create a visual effect along with an explosive noise.  They are induced electronically in a cylinder with no projectile, wadding or wrapping.

**POLICY NUMBER:** T7 -0C ▮ 364799-00                                    **COMM** ▮ **CIAL GENERAL LIABILITY**

**THIS ENDORSEMENT CHANGES THE POLICY.    PLEASE READ IT CAREFULLY.**

## PARTICIPANT LIABILITY - SPORTS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Insurance provided to you under Section I., Coverage A. includes those sums which you become legally obligated to pay because of actions brought against you for "bodily injury" or "property damage" by a PARTICIPANT while practicing for or participating in any contest or exhibition of an athletic or sports nature sponsored by you.

The limit of insurance with respect to this endorsement for Participant Legal Liability is ___$1,000,000.00___ each occurrence. For the purpose of this endorsement, this limit replaces the limit of insurance shown on the Declarations for each occurrence.

It is also agreed that a ___$0.00___ each occurrence deductible shall apply to all claims arising out of Participants Legal Liability coverages. Our obligation under the Bodily Injury Liability and Property Damage Liability Coverages to pay damages on your behalf applies only to the amount of damages in excess of any deductible amounts stated above as applicable to such coverages, and the limits of insurance applicable to each occurrence for such coverages will be reduced by the amount of such deductible. The Aggregate limits for such coverages shall not be reduced by the applications of such deductible amount.

This insurance does not apply to:

Claims or actions brought by one player against another player. However, coverage remains in effect for the first Named Insured and/or any applicable Additional Insureds who have been endorsed onto the policy.

The definition of a Participant shall be as follows:

The term Participant shall include players, coaches, managers, staff members, team workers, officials, [cheerleaders], and other personnel who have been granted proper authorization to enter any restricted area(s).

The restricted area(s) shall include those areas which are occupied by players and to which access by the general public is restricted or prohibited. Such areas shall be designated as restricted beginning [two hours] prior to the official starting time of the activity/event and ending [at] the official conclusion of the activity/event. ["Half-time" shall not be included within the period of time designated for the restricted area(s).]

S-277  CG                                                                                          4-89

POLICY NUMBER: T7 -00037964799-00                COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ADDITIONAL INSUREDS**
**OWNERS AND/OR LESSORS OF PREMISES, SPONSORS OR CO-PROMOTERS**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Policy # T7 -0003796479900 is amended to include as an additional Insured any person or organization of the types designated below, but only with respect to liability arising out of your operations:

1.  Owners and/or lessors of the premises leased, rented, or loaned to you, subject to the following additional exclusions:

    A.  This insurance applies only to an occurrence which takes place while you are a tenant in the premises;

    B.  This insurance does not apply to Bodily Injury or Property Damage resulting from structural alterations, new construction or demolition operations performed by or on behalf of the owner and/or lessor of the premises;

    C.  This insurance does not apply to any design defect or structural maintenance of the premises by or on behalf of the owner and/or lessor.

    With respect to any "Additional Insured" included under this policy, this insurance does not apply to the sole negligence of such "Additional Insured."

2.  Sponsors.

3.  Co-Promoters.

S-157 (10/89) CG

CL 261
(11-85)

POLICY NUMBER: T7 -00037964799-00

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

CG 20 26 11 85

# ADDITIONAL INSURED–DESIGNATED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

**Name of Person or Organization:**
AS REQUESTED AND ENDORSED

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule as an insured but only with respect to liability arising out of your operations or premises owned by or rented to you.

Copyright, Insurance Services Office, Inc., 1984

POLICY NUMBER: T7 -00037964799-00                                    COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES YOUR POLICY.  PLEASE READ IT CAREFULLY.**

# UNINTENTIONAL ERROR/KNOWLEDGE AND NOTICE OF ACCIDENT OR OCCURRENCE

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

Those conditions indicated by **X** apply to this policy:

___X___     UNINTENTIONAL ERROR OR OMISSION

Failure of the insured to disclose all hazards existing as of the inception date of the policy shall not prejudice the insured with respect to the coverage afforded by this policy provided such failure or omission is unintentional.

___X___     KNOWLEDGE OF ACCIDENT OR OCCURRENCE

Knowledge of an accident by the agent, servant or employee of the insured shall not in itself consti- tute knowledge of the insured unless an executive officer of the insured's corporation shall have re- ceived such notice from its agent, servant or employee.

___X___     NOTICE OF ACCIDENT OR OCCURRENCE

If the insured reports the occurrence of an accident to a compensation carrier, which later develops into a liability claim under this policy, the insured's failure to report the accident to us at the time of its occurrence shall not be deemed in violation of the policy's general conditions, provided the in- sured notifies us immediately upon becoming aware that the accident is of a liability nature.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## BLANKET ADDITIONAL INSURED

This endorsement modifies insurance provided under the following:

> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> LIQUOR LIABILITY COVERAGE PART
> EMPLOYEE BENEFIT LIABILITY COVERAGE PART
> HIRED AUTOMOBILE AND NON-OWNERSHIP AUTOMOBILE LIABILITY COVERAGE PART

The "Who is an Insured" provision is amended to include any person or organization for whom the Named Insured has specifically agreed under WRITTEN contract to procure Bodily Injury, Property Damage, Personal Injury or other liability insurance coverage presently provided by this policy but only to the extent that the Named Insured has agreed prior to the loss to provide such insurance.  The insurance provided hereunder shall be primary insurance, other provisions of this policy to the contrary not withstanding, providing the Named Insured has agreed to provide primary insurance.

POLICY NUMBER:   T7 -00037964799-00

**CL 232**
**(11/85)**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

CG 02 12 11 85

# CANCELLATION BY US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

### SCHEDULE

**Number of Days** ___90___

(If no entry appears above, information required to complete this Schedule will be shown in the Declarations as applicable to this endorsement.)

Paragraph 2. of CANCELLATION (Common Policy Conditions) is replaced by the following:

**2.** We may cancel this Coverage Part by mailing or delivering to the first Named Insured written notice of cancellation at least:

**a.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium;  or

**b.** The number of days shown in the Schedule before the effective date of cancellation if we cancel for any other reason.

Copyright, Insurance Services Office, Inc., 1984

T7 -00037964799-00

IL 02 62 12 95

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# GEORGIA CHANGES - CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

> BOILER AND MACHINERY COVERAGE PART
> COMMERCIAL AUTOMOBILE COVERAGE PART
> COMMERCIAL CRIME COVERAGE PART
> COMMERCIAL INLAND MARINE COVERAGE PART
> COMMERCIAL PROPERTY COVERAGE PART
> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> FARM COVERAGE PART
> LIQUOR LIABILITY COVERAGE PART
> POLLUTION LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** Paragraph **A.1.** of the CANCELLATION Common Policy Condition is replaced by the following:

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation stating a future date on which the policy is to be cancelled, subject to the following:

   **a.** If only the interest of the first Named Insured is affected, the effective date of cancellation will be either the date we receive notice from the first Named Insured or the date specified in the notice, whichever is later. However, upon receiving a written notice of cancellation from the first Named Insured, we may waive the requirement that the notice state the future date of cancellation, by confirming the date and time of cancellation in writing to the first Named Insured.

   **b.** If by statute, regulation or contract this policy may not be canceled unless notice is given to a governmental agency, mortgagee or other third party, we will mail or deliver at least 10 days notice to the first Named Insured and the third party as soon as practicable after receiving the first Named Insured's request for cancellation.

Our notice will state the effective date of cancellation, which will be the later of the following:

   **(1)** 10 days from the date of mailing or delivering our notice, or

   **(2)** The effective date of cancellation stated in the first Named Insured's notice to us.

**B.** Paragraph **A.5.** of the CANCELLATION Common Policy Condition is replaced by the following:

5. Premium Refund

   **a.** If this policy is cancelled, we will send the first Named Insured any premium refund due.

   **b.** If we cancel, the refund will be pro rata, except as provided in **c.** below.

   **c.** If the cancellation results from failure of the first Named Insured to pay, when due, any premium to us or any amount, when due, under a premium finance agreement, then the refund may be less than pro rata. Calculation of the return premium at less than pro rata represents a penalty charged on unearned premium.

   **d.** If the first Named Insured cancels, the refund may be less than pro rata.

   **e.** The cancellation will be effective even if we have not made or offered a refund.

Copyright, Insurance Services Office, Inc., 1995
Copyright, ISO Commercial Risk Services, Inc., 1995

# TIG INSURANCE℠

Policy No.   T7 -00037964799-00
Replacement No.

**Liquor Liability - Declarations**

**NAMED INSURED AND ADDRESS:**

WORLD CHAMPIONSHIP WRESTLING, INC.
(SEE IL1201-01)
PO BOX 105366
ATLANTA , GA 30348

**FORM OF BUSINESS**

☐ Individual      ☐ Joint Venture
☐ Partnership   ☒ Organization *(other than a*
                                  *partnership or joint venture)*

**RETROACTIVE DATE:** *(CG 00 34 only)*  Section I of this insurance does not apply to "bodily injury" or "property damage" which occurs before the following Retroactive Date(if any).

**LIMITS OF INSURANCE**

| | |
|---|---|
| Aggregate Limit | $1,000,000.00 |
| Each Common Cause Limit | $1,000,000.00 |

**LOCATION OF ALL PREMISES YOU OWN, RENT OR OCCUPY:**

VARIOUS LOCATIONS

**PREMIUM**
Advance Premium for this Coverage Part is _____ $1,500.00

**ENDORSEMENTS ATTACHED TO THIS COVERAGE PART**

CL 176 2-86, CG 0033 1-96

LB 17340

1-86

T7 -00037964799-00

# QUICK REFERENCE
# LIQUOR LIABILITY COVERAGE PART

## READ YOUR POLICY CAREFULLY

The Liquor Liability Coverage Part in your policy consists of Declarations, a Coverage Form (either CG 00 33 or CG 00 34), Common Policy Conditions and Endorsements, if applicable. Following is a Quick Reference indexing of the principal provisions contained in each of the components making up the Coverage Part, listed in sequential order, except for the provisions in the Declarations which may not be in the sequence shown.

### DECLARATIONS
Named Insured and Mailing Address
Policy Period
Limits of Insurance
Description of Business and Location of Premises
Forms and Endorsements applying to the Coverage Part at time of issue

### COVERAGE FORM (CG 00 33 or CG 00 34)
SECTION I - LIQUOR LIABILITY COVERAGE
Insuring Agreement
Exclusions
Supplementary Payments
SECTION II - WHO IS AN INSURED
SECTION III - LIMITS OF INSURANCE
SECTION IV - LIQUOR LIABILITY CONDITIONS
Bankruptcy
Duties in the Event of an Injury, Claim or Suit
Legal Action Against Us
Other Insurance
Premium Audit
Representations
Separation of Insureds
Transfer of Rights of Recovery Against Others to Us
When We Do Not Renew (applicable to CG 00 34 only)
Your Right to Claim and "Injury" Information (applicable to CG 00 34 only)
SECTION V - EXTENDED REPORTING PERIODS (applicable to CG 00 34 only)
SECTION VI - DEFINITIONS (SECTION V in CG 00 33)

### COMMON POLICY CONDITIONS (IL 00 17)
Cancellation
Changes
Examination of Your Books and Records
Inspections and Surveys
Premiums
Transfer of Your Rights and Duties under this Policy

### ENDORSEMENTS (If Any)

Includes copyrighted material of Insurance Services Office, Inc., with its permission. Copyright, Insurance Services Office, Inc., 1985, 1986

CL 175 (2-86)

# LIQUOR LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under WHO IS AN INSURED (Section II).

Other words and phrases that appear in quotation marks have special meaning. Refer to DEFINITIONS (Section V).

## SECTION I - LIQUOR LIABILITY COVERAGE

### 1. Insuring Agreement

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "injury" to which this insurance applies if liability for such "injury" is imposed on the insured by reason of the selling, serving or furnishing of any alcoholic beverage. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "injury" to which this insurance does not apply. We may, at our discretion, investigate any "injury" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (Section III); and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS.

**b.** This insurance applies to "injury" which occurs during the policy period in the "coverage territory".

### 2. Exclusions

This insurance does not apply to:

**a. Expected or Intended Injury**

"Injury" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Workers Compensation and Similar Laws**

Any obligation of the insured under a workers compensation, disability benefits or unemployment compensation law or any similar law.

**c. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of

    **(a)** Employment by the insured; or

    **(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of paragraph **(1)** above.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the "injury".

**d. Liquor License Not In Effect**

"Injury" arising out of any alcoholic beverage sold, served or furnished while any required license is suspended or after such license expires, is cancelled or revoked.

**e. Your Product**

"Injury" arising out of "your product". This exclusion does not apply to "injury" for which the insured or the insured's indemnitees may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

(2) "Property damage" to property:

    (a) Owned or occupied by, or

    (b) Rented or loaned

    to that "employee", any of your other "employees", by any of your partners or members (if you are a partnership or joint venture), or by any of your members (if you are a limited liability company).

b. Any person or organization having proper temporary custody of your property if you die, but only:

    (1) With respect to liability arising out of the maintenance or use of that property; and

    (2) Until your legal representative has been appointed.

c. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will be qualified as a Named Insured if there is no other similar insurance available to that organization. However:

a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier; and

b. Coverage does not apply to "injury" that occurred before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III - LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

a. Insureds;

b. Claims made or "suits" brought; or

c. Persons or organizations making claims or bringing "suits".

2. The Aggregate Limit is the most we will pay for all "injury" as the result of the selling, serving or furnishing of alcoholic beverages.

3. Subject to the Aggregate Limit, the Each Common Cause Limit is the most we pay for all "injury" sustained by one or more persons or organizations as the result of the selling, serving or furnishing of any alcoholic beverage to any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV - LIQUOR LIABILITY CONDITIONS

1. **Bankruptcy.**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Injury, Claim Or Suit.**

a. You must see to it that we are notified as soon as practicable of an "injury" occurs which may result in a claim. To the extent possible notice should include:

    (1) How, when and where the "injury" took place;

    (2) The names and addresses of any injured persons and witnesses; and

    (3) The nature and location of any "injury" or damage arising out of an occurrence.

b. If a claim is made or "suit" is brought against any insured, you must:

    (1) Immediately record the specifics of the claim or "suit" and the date received; and

    (2) Notify us as soon as practicable.

You must see to it that we have received written notice of the claim or "suit" as soon as practicable.

 Copyright, Insurance Services Office, Inc., 1994

8. **Transfer of Rights of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

9. **When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

## SECTION V - DEFINITIONS

1. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

2. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, provided the "injury" does not occur in the course of travel or transportation to or from any place not included in a. above; or

   c. All parts of the world if:

      (1) The "injury" arises out of:

         (a) Goods or products made or sold by you in the territory described in a. above; or

         (b) The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business; and

      (2) The insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in a. above or in a settlement we agree to.

3. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

4. "Executive Officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

5. "Injury" means all damages, including damages because of "bodily injury" and "property damage", and including damages for care, loss of services or loss of support.

6. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

7. "Property damage" means:

   a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

   b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the occurrence that caused it.

8. "Suit" means a civil proceeding in which damages because of "injury" to which this insurance applies are alleged. "Suit" includes:

   a. An arbitration proceeding in which such damages are claimed to which the insured must submit or does submit with our consent; or

   b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

9. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

10. "Your product" means:

    a. Any goods or products, other than real property, manufacturer, sold, handled, distributed or disposed of by:

       (1) You;

       (2) Others trading under your name; or

       (3) A person or organization whose business or assets you have acquired; and

    b. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

 Copyright, Insurance Services Office, Inc., 1994



Policy No.  T7 -00037964799-00
Replacement No.

**Employee Benefit Program Liability -
Declarations**

**NAMED INSURED AND ADDRESS:**

WORLD CHAMPIONSHIP WRESTLING, INC.
(SEE IL1201-01)
PO BOX 105366
ATLANTA, GA 30348

**RETROACTIVE DATE:** Section I of this insurance does not apply to negligent acts or omissions which oc-
cur before the following Retroactive Date (if any):   04/01/98

**LIMITS OF INSURANCE**

| | |
|---|---|
| Aggregate Limit | $1,000,000.00 |
| Each Occurrence Limit | $1,000,000.00 |

**DEDUCTIBLE**

The deductible is _____ $1,000.00 _____ .  This reduces the Limit of Liability shown as
applicable to Each Occurrence Limit.

**PREMIUM**

Advance Premium for this Coverage Part is _____  $6,933.00

**ENDORSEMENTS ATTACHED TO THIS COVERAGE PART:**

LB 17513 4-86, LB 17984A 9-87

LB 17344

1-86

T7 -00037964799-00

## QUICK REFERENCE
## EMPLOYEE BENEFIT PROGRAMS LIABILITY COVERAGE PART

*Please read your policy carefully.*

## DECLARATIONS PAGES
Named Insured and Mailing Address
Policy Period
Deductible
Limits of Insurance

## SECTION I - COVERAGES                                    Beginning on Page
Insuring Agreement  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1
Exclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1
Supplementary Payments  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

## SECTION II - WHO IS AN INSURED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

## SECTION III - LIMITS OF INSURANCE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

## SECTION IV - CONDITIONS
Bankruptcy  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2
Duties In The Event of Occurrence, Claim or Suit  . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2
Legal Action Against Us  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3
Other Insurance  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3
Premium Audit  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3
Representations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3
Separation of Insureds  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4
Transfer of Rights of Recovery Against Others To Us  . . . . . . . . . . . . . . . . . . . . . . . . .   4

## SECTION V - EXTENDED REPORTING PERIOD OPTION  . . . . . . . . . . . . . . . . . .   4

## SECTION VI - DEFINITIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

## COMMON POLICY CONDITIONS
Cancellation
Changes
Examination of Your Books and Records
Inspections and Surveys
Premiums
Transfer of Your Rights and Duties Under This Policy

## ENDORSEMENTS (If Any)

T7 -00037964799-00

# EMPLOYEE BENEFIT PROGRAMS LIABILITY COVERAGE FORM

*This form provides Claims Made coverage.*
*Please read the entire form carefully.*

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under WHO IS AN INSURED (Section II).

Other words and phrases that appear in quotation marks have special meaning. Refer to DEFINITIONS (Section VI).

## SECTION I - COVERAGE

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages to an employee, former employee or heirs because of negligent acts or omissions in the "administration" of the insured's "employee benefit programs" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (Section III); and

      (2) Our right and duty to defend end when we have used up the applicable Limits of Insurance in the payment of judgments or settlements under this coverage.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS.

   b. This insurance applies to negligent acts or omissions in the "administration" of the insured's "employee benefit programs" only if:

      (1) The negligent acts or omissions are caused by an "occurrence" that takes place in the "coverage territory";

      (2) The negligent acts or omissions did not occur before the Retroactive Date, if any, shown in the Declarations or after the end of the policy period; and

      (3) A claim for damages because of the negligent acts or omissions is first made against the insured, in accordance with paragraph c. below, during the policy period or any Extended Reporting Period we provide under EXTENDED REPORTING PERIODS (Section V).

   c. A claim by a person seeking damages will be deemed to have been made at the earlier of the following times:

      (1) when notice of such claim is received and recorded by any insured or by us, whichever comes first; or

      (2) When we make a settlement in accordance with paragraph 1.a. above.

      All claims for damages to the same person, including resulting damages claimed by others at any time, will be deemed to have been made at the time the first of those claims is made against any insured.

   d. Damages include prejudgment interest awarded against the insured.

2. **Exclusions**

   This insurance does not apply to:

   a. Any responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974 (ERISA), or any amendment of the act.

   b. Damage, destruction, loss or loss of use of any tangible or intangible property owned by or in the care, custody or control or the insured or anyone for whom the insured is responsible.

   c. Damages based on errors or omission in giving or failing to give opinions, statements or advice on participating or not participating in investment plans.

   d. Damages because of discrimination.

   e. Damages because of failure to comply with worker's compensation, unemployment compensation, disability benefits, social security laws or any similar law.

1

**SECTION IV CONDITIONS**

1. **Bankruptcy.**

   Bankruptcy or insolvency of the insured or the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Claim Or Suit.**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the "occurrence" took place;

      (2) The names and address of any injured persons and witnesses; and

      (3) The nature and location of any injury or damage arising out of the "occurrence".

      Notice of an "occurrence" is not notice of a claim.

   b. If a claim is received by any insured, you must:

      (1) Immediately record the specifics of the claim or "suit" and the date received; and

      (2) Notify us as soon as practicable.

      You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   c. You and any other involved insured must:

      (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

      (2) Authorize us to obtain records and other information;

      (3) Cooperate with us in the investigation, settlement or defense of the claim or "suit"; and

      (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

   d. No insured will, except at their own cost, voluntarily make a payment, assume any obligation or incur any expense without our consent.

3. **Legal Action Against Us.**

   No person or organization has a right under this Coverage Part:

   a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable Limits of Insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

4. **Other Insurance.**

   If other valid and collectible insurance is available to the insured for a loss we cover under this Coverage Part, our obligations are limited as follows:

   a. Primary Insurance

      This insurance is primary except when b. below applies. When this insurance is primary our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.

   b. Excess Insurance

      This insurance is excess over any other insurance whether primary, excess, contingent or on any other basis that is effective prior to the beginning of the policy period shown in the Declarations of this insurance and applies to "employee benefit programs" on other than a claims made basis, if:

      (1) No Retroactive Date is shown in the Declarations of this insurance; or

      (2) The other insurance has a policy period which continues after the Retroactive Date shown in the Declarations of this insurance.

      When this insurance is excess, we will have no duty under this insurance to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

      When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

      (1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

      (2) The total of all deductible and self-insured amounts under all that other insurance.

      We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

LB 17984 A

9-87

1. We will provide one or more Extended Reporting Periods, as described below, if:

   a. This Coverage Part is cancelled or not renewed; or

   b. We renew or replace this Coverage Part with other insurance that:

      (1) Has a Retroactive Date later than the date shown in the Declarations of this Coverage Part; or

      (2) Does not apply to negligent acts or omissions in the "administration" of the insured's "employee benefit programs" on a claims-made basis.

2. Extended Reporting Periods do not extend the policy period or change the scope of coverage provided. They apply only to claims for damages that occur before the end of the policy period but not before the Retroactive Date, if any, shown in the Declarations.

   Once in effect, Extended Reporting Periods may not be cancelled.

3. A Basic Extended Reporting Period is automatically provided without additional charge. This period started with the end of the policy period and lasts for:

   a. Five years for claims because of negligent acts or omissions in the "administration" of the insured's "employee benefit programs" arising out of an "occurrence" reported to us, not later than 60 days after the end of the policy period, in accordance with paragraph 2.a. of CONDITIONS (Section IV); or

   b. Sixty days for all other claims.

   The Basic Extended Reporting Period does not apply to claims that are covered under any subsequent insurance you purchase, or that would be covered but for exhaustion of the amount of insurance applicable to such claims.

4. A Supplemental Extended Reporting Period is available, but only for an endorsement and for an extra charge. This supplemental period starts when the Basic Extended Reporting Period, as set forth in paragraph 3. above, ends.

The first Named Insured must give us a written request for the endorsement within 60 days after the end of the policy period. The Supplemental Extended Reporting Period will not go into effect unless the first Named Insured pays the additional premium promptly when due.

We will determine the additional premium in accordance with our rules and rates. In doing so, we may take into account the following:

a. The exposures insured;

b. Previous types and amounts of insurance;

c. Limits of Insurance available under this Coverage Part for future payments of damages; and

d. Other related factors.

The additional premium will not exceed 200% of the annual premium for this Coverage Part.

This endorsement shall set forth the terms, not inconsistent with this Section, applicable to the Supplemental Extended Reporting Period, including a provision to the effect that the insurance afforded for claims first received during such period is excess over any other valid and collectible insurance available under policies in force after the Supplemental Extended Reporting Period starts.

5. The Basic Extended Reporting Period does reinstate or increase the Limits of Insurance.

6. If the Supplemental Extended Reporting Period is in effect, we will provide the separate aggregate Limits of Insurance described below, but only for claims first received and recorded during the Supplemental Extended Reporting Period.

The separate aggregate Limits of Insurance will be equal to the dollar amount shown in the Declarations in effect at the end of the policy period for the Aggregate Limit.

Paragraph 2. of LIMITS OF INSURANCE (Section III) will be amended accordingly. The Each Occurrence Limit and the deductible amount shown in the Declarations will then continue to apply, as set forth in paragraphs 3. and 4. of that Section.

## SECTION VI - DEFINITIONS

1. "Administration" means the following which are authorized by the Named Insured with respect to "employee benefit programs":

   a. Counseling of employees with respect to eligibility in "employee benefit programs";

   b. Interpretation of programs;

   c. Record keeping; and

   d. Enrollment, termination or cancellation of employees in the "employee benefit programs".

2. "Coverage Territory" means the United States of America (including its territories and possessions), Puerto Rico and Canada.

 **TIGINSURANCE**sm

**Stop Gap Liability Declarations**

**POLICY NUMBER**   T7 -00037964799-00

**ITEM ONE - NAMED INSURED AND ADDRESS**
WORLD CHAMPIONSHIP WRESTLING, INC.

(SEE IL1201-01)
PO BOX 105366
ATLANTA, GA 30348
FORM OF BUSINESS: ☒ Corporation   ☐ Partnership   ☐ Individual   ☐ Other _____

**ITEM TWO - SCHEDULE OF COVERAGE AND LIMITS**

Insured's State(s) of Operations:   ☒ Nevada        ☒ Washington
                                     ☒ North Dakota  ☒ West Virginia
                                     ☒ Ohio          ☐ Wyoming

LIMITS OF INSURANCE

Bodily Injury by Accident - Each Accident . . . . . . . . . . . . . . . . . . . . . . . . . . .        $1,000,000
Bodily Injury by Disease - Each Employee . . . . . . . . . . . . . . . . . . . . . . . . . .        $1,000,000
Bodily Injury Aggregate Limit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        $1,000,000

**RATES AND PREMIUMS**

| State | Payroll | *Rate | Minimum Premium | Advance Premium |
|-------|---------|-------|-----------------|-----------------|
| ND    |         |       |                 |                 |
| NV    |         |       |                 |                 |
| OH    |         |       |                 |                 |
| WA    |         |       |                 |                 |
| WV    |         |       |                 |                 |
| WY    |         |       |                 |                 |
|       |         |       | Total Advance Premium | $3,456.00 |

*Per $100 of payroll

**ENDORSEMENTS**
  LB 22198 10-92 ,

I B 22197

10-92



**Stop Gap Liability Declarations**

**POLICY NUMBER**   T7 -00037964799-00

**ITEM ONE - NAMED INSURED AND ADDRESS**

WORLD CHAMPIONSHIP WRESTLING, INC.

(SEE IL1201-01)
PO BOX 105366
ATLANTA, GA 30348

FORM OF BUSINESS: ☒ Corporation   ☐ Partnership   ☐ Individual   ☐ Other _____

**ITEM TWO - SCHEDULE OF COVERAGE AND LIMITS**

Insured's State(s) of Operations:   ☒ Nevada          ☒ Washington
                                     ☒ North Dakota    ☒ West Virginia
                                     ☒ Ohio            ☐ Wyoming

LIMITS OF INSURANCE

Bodily Injury by Accident - Each Accident . . . . . . . . . . . . . . . . . . . . . . . . . .   _____ $1,000,000

Bodily Injury by Disease - Each Employee . . . . . . . . . . . . . . . . . . . . . . . . .   _____ $1,000,000

Bodily Injury Aggregate Limit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   _____ $1,000,000

**RATES AND PREMIUMS**

| State | Payroll | *Rate | Minimum Premium | Advance Premium |
|-------|---------|-------|-----------------|-----------------|
| ND    |         |       |                 |                 |
| NV    |         |       |                 |                 |
| OH    |         |       |                 |                 |
| WA    |         |       |                 |                 |
| WV    |         |       |                 |                 |
| WY    |         |       |                 |                 |

Total Advance Premium   93456.00 $1152.00

*Per $100 of payroll

**ENDORSEMENTS**
  LB 22198 10-92 ,

LB 22197                                                                                       10-92

T7 -00037964799-00

## Stop Gap Liability Coverage Form

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we," "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under WHO IS AN INSURED (SECTION II).

Other words and phrases that appear in quotation marks have special meaning. Refer to DEFINITIONS (SECTION V).

### SECTION I - COVERAGE - BODILY INJURY LIABILITY

1. Insuring Agreement.

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" to which this insurance does not apply. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

      (2) Our right and duty to defend end when we have used up the applicable Limit of Insurance in the payment of judgments or settlements.

   b. This insurance applies to "bodily injury" by accident or "bodily injury" by disease. However:

      (1) The "bodily injury" must arise out of and in the course of the injured employee's employment by you; and

      (2) The employment must be necessary or incidental to your work in a state listed on the Declarations; and

      (3) (a) If the "Bodily injury" is by accident, it must occur during the policy period;

          (b) If the "Bodily injury" is by disease,

              A. It must be caused or aggravated by the conditions of your employment; and

              B. The employee's last day of last exposure to the conditions causing or aggravating such "bodily injury" by disease must occur during the policy period.

      (4) If you are sued, the original suit and any related legal actions for damages for "bodily injury" by accident or by disease must be brought in the "coverage territory."

      Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury."

2. Exclusions

   This insurance does not apply to:

   a. "Bodily injury" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.

   b. Punitive or exemplary damages because of "bodily injury" to an employee employed in violation of any law.

   c. "Bodily injury" to an employee while employed in violation of law with your actual knowledge or the actual knowledge of any of your partners or of any of your executive officers.

   d. Any obligation imposed by law under workers compensation, occupational disease, unemployment compensation, disability benefits or any similar law.

   e. "Bodily injury" intentionally caused or aggravated by you, or "bodily injury" resulting from an act which is determined to have been committed by you with the belief that an injury is substantially certain to occur.

   f. "Bodily injury" occurring outside the "coverage territory." This exclusion does not apply to "bodily injury" to a citizen or resident of the United States of America or Canada who is temporarily outside these countries.

   g. "Bodily injury" arising out of any:

      (1) Refusal to employ;

      (2) Termination of employment;

1

LB 22198

10-92

2. The limit shown for Bodily (   ) y by Accident - Each Accident is the most we will pay for all damages covered by this insurance because of "bodily injury" to one or more employees in any one accident.

A disease is not "bodily injury" by accident unless it results directly from "bodily injury" by accident.

3. The limit shown for Bodily Injury by Disease - Each Employee is the most we will pay for all damages because of "bodily injury" by disease to any one employee.

"Bodily injury" by disease does not include disease that results directly from a "bodily injury" by accident.

4. The limit shown for Bodily Injury Aggregate Limit is the most we will pay for all damages covered by

this insurance( ) d arising out of "bodily injury" by accident or "bodily injury" by disease, regardless of the number of employees who sustain "bodily injury" by accident or "bodily injury" by disease.

5. We will not pay any claims for damages after we have paid the applicable limit of our liability under this insurance.

The limits of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV - STOP GAP LIABILITY CONDITIONS

We have no duty to provide coverage under this Coverage Part unless you and any other insured have fully complied with the Conditions contained in this Coverage Part.

1. Bankruptcy.

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. Duties in the Event of Injury, Claim or Suit.

a. You must see to it that we are notified as soon as practicable of an injury which may result in a claim. To the extent possible, notice should include:

(1) How, when and where the injury took place;

(2) The names and addresses of any injured persons and witnesses.

b. If a claim is made or "suit" is brought against any insured, you must:

(1) Immediately record the specifics of the claim or "suit" and the date received; and

(2) Notify us as soon as possible.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit;"

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit;" and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury to which this insurance may also apply.

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. Legal Action Against Us.

No person or organization has a right under this Coverage Part:

a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

4. Other Insurance.

If other valid and collectible insurance is available to the insured for a loss we cover under this Coverage Part, this insurance is excess over any of the other insurance that was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part. We have no duty to defend the insured against "suit" if any other insurer has a duty to defend the insured against that "suit". If no insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

We will pay only our share of the amount of the loss, if any, that exceeds the sum of:

a. The total amount that all other insurance would pay for the loss in the absence of this insurance; and

3



Greg S. Anthony, ARM
Corporate Claims Analyst

May 22, 2002

David Vigilante, Esq.
Turner Broadcasting System
CNN Center, Box 105573
Atlanta, GA 30348-5773

**Re:**     <u>**Sidney R. Eudy v. Universal Wrestling Company Inc., et al.**</u>
               **TIG Claim Number B02009680**

Dear Mr. Vigilante:

TIG Insurance Company has received a request for coverage in the above-referenced claim. TIG was provided with a courtesy copy of the complaint prepared by the plaintiff, and understands that this same complaint was filed as a lawsuit. The purpose of this letter is to set forth TIG's review of the allegations in the document provided and the relevant insurance policy provisions. <u>If the complaint actually filed differs in any manner from the courtesy copy provided to TIG, please furnish it to the undersigned at once so a proper determination can be made.</u>

### Underlying Allegations

Sidney R. Eudy, the plaintiff, claims he entered into a contract to perform as a professional wrestler for World Championship Wrestling, Inc. ("WCW"), for the period June 9, 1999 through June 8, 2002. He contends that he was required to wrestle even though he was injured in the early part of 2000, and was told he would be relieved of his contractual obligations for several appearances. Thereafter, and over his objections, he claims he was required to jump from the top ropes of the ring onto his opponent. He sustained a compound fracture to his left leg during the maneuver, which caused his bones to protrude through his boot in an event that was aired live on the national television.

Eudy claims defendants proceeded to broadcast the incident repeatedly in order to boost television ratings and earnings. Eudy contends further that defendants broadcast one of Eudy's doctors describing the injuries and treatment in graphic detail, including a display of Eudy's x-rays. Eudy asserts that defendants thereby shared his confidential medical information with the general public to increase ratings and profitability. Thereafter, Eudy states defendants cut his pay in half, tampered with his insurance benefits, and ultimately terminated his contract. As a result, Eudy seeks to recover for "breach of contract," "breach of fiduciary duty" and "unjust enrichment."

EXHIBIT
*E*

TIG INSURANCE COMPANY • b20        Irving, Texas 75039 • phone 972 831 5000

### Relevant Insurance Policy Provisions

TIG has analyzed coverage under policy number T7 00379647992 issued to WCW as the named insured for the period April 1, 2000 to April 1, 2001. If you contend that any other policy is relevant to coverage in this case, please inform the undersigned at this time.

Under the Commercial General Liability Coverage Form (CGL), TIG agreed to pay sums that the insured becomes legally obligated to pay for bodily injury, property damage, advertising injury or personal injury. The draft complaint does not seek to recover damages for the bodily injury, but instead seeks to recover for alleged breaches of contractual and fiduciary duties. Essentially, Eudy seeks to recover for defendants' attempts to capitalize on his injury, and not for damages that he himself sustained. While television broadcasts was the medium used, the policy limits "personal or advertising injury" to certain offenses, none of which appear to apply to this case. Lastly, to the extent Eudy seeks disgorgement of defendants' profits, unjust enrichment is an equitable remedy that is beyond the scope of legal damages covered by a liability policy. The policy further contains exclusions that might apply even if the claims were covered by the substantive terms of the policy.

### Conclusion

Based on the foregoing analysis, coverage appears to be absent for this claim. If you believe that TIG has misinterpreted the material facts or relevant insurance policy provisions, please inform the undersigned immediately so the matter can be brought to a conclusion. Nothing stated herein relieves defendants of their responsibility to keep TIG informed of any additions or amendments to the claim consistent with the reporting requirements of the policy of insurance issued by TIG.

By mentioning certain provisions in this letter, TIG does not imply that no other policy provisions or laws may impact the coverage analysis in this case. TIG expressly reserves the right to rely upon any condition, provision or exclusion in the policy that may limit or preclude coverage, whether those terms are discussed in this letter or not.

TIG Insurance Company

Greg S. Anthony

cc:   Lance Brenn
      K&K Insurance
      PO Box 2338
      Fort Wayne, In 46801



May 7, 2003

<u>CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>

David Vigilante, Esq.
Turner Broadcasting System
CNN Center, Box 105573
Atlanta, Georgia 30348-5773

Johnny Laurinaitis
c/o Bradley S. Small, Esq.
Manatt Phelps & Phillips, LLP
11355 West Olympic Boulevard
Los Angeles, California 90064

> Re:   <u>Sidney R. Eudy v. Universal Wrestling Company Inc., et al.</u>
>        <u>Superior Court of Fulton County, Civil Action Number 02CV48513</u>
>        <u>TIG Claim Number B02009680</u>
>        <u>TIG Policy Number T7 0003796479902</u>

Dear Sirs:

TIG Insurance Company has reviewed the above referenced lawsuit for coverage. After reviewing the allegations in light of the Commercial General Liability ("CGL") insurance policy referenced below, and after conducting an independent investigation of the facts, TIG has determined that coverage may be lacking for the claims asserted by Mr. Eudy. TIG is therefore willing to defend WCW and Laurinaitis under a reservation of rights to deny coverage, including a withdrawal of the defense at any time. This letter sets forth TIG's potential coverage defenses and its reasoning and analysis of the relevant concerns.

In making its determinations, TIG has based its evaluation on the allegations asserted in Mr. Eudy's complaint and Second Amended Complaint. No other pleading(s) setting forth Mr. Eudy's assertions have been furnished to TIG, as required by the notice provisions of the policy. If there are any additional documents you wish TIG to review, please forward immediately for review. TIG does not base its decision on the truth of the matters asserted by Mr. Eudy, and acknowledges that his factual assertions may be inaccurate, false, or embellished.

<u>UNDERLYING FACTS</u>

Eudy alleges that he entered into a contract with World Championship Wrestling, Inc. ("WCW") to perform as a professional wrestler for the period June 9, 1999 through June 8, 2002. He contends that he was required to wrestle even after being injured in the



EXHIBIT
F

TIG INSURANCE COMPANY • 5205 _____ing, Texas 75039 • phone: 972 831 5000

*May 7, 2003*
2

early part of 2000, and relieved of his contractual obligations for several appearances. He further claims he was required to jump, over his objection, from the top ropes of the ring. He sustained a compound fracture to his left leg during the maneuver, which caused his bones to protrude through his boot in an event that was aired live on the national television.

Eudy claims WCW (as the predecessor organization of UCW) proceeded to broadcast the incident repeatedly to boost its own ratings and earnings. Eudy contends also that WCW televised one of Eudy's doctors describing his injury and treatment, thereby sharing his confidential medical information with the general public to further increase its ratings and profitability. He also claims WCW cut his pay in half, tampered with his insurance benefits, and ultimately terminated his contract.

In his original complaint, Eudy sought to recover for "breach of contract," "breach of fiduciary duty," and "unjust enrichment." TIG denied coverage for these claims under the CGL policy on the basis that the complaint did not seek recovery of covered damages. TIG has, however, paid Eudy's medical bills pursuant to a separate workers' compensation policy issued by TIG to WCW.

Eudy has since filed a Second Amended Complaint adding Johnny Laurinaitis as a defendant and adding claims for "negligence," "negligent retention," "negligent infliction of emotional distress," and "tortious interference with contractual relations." The Second Amended Complaint relies on the same statement of facts as the original complaint.

TIG has conducted an independent investigation into some of the facts of Eudy's claims, as necessary to assess its coverage obligations. In that regard, TIG has learned that Mr. Laurinaitis was an employee of WCW. Further, TIG has independently requested and reviewed Eudy's contract with WCW. Although the document refers to Eudy as an "independent contractor," it specifically calls for workers' compensation benefits to be available as the exclusive remedy. Coupled with the degree of control WCW exercised over Eudy's work, TIG believes a court would deem Eudy to be an employee, as addressed further herein.

With this overview of the pertinent facts in mind, we will now address the policy provisions at issue.

## CGL POLICY

TIG has analyzed its coverage obligations pursuant to a CGL policy issued to WCW as named insured. The CGL policy bears policy number T7 0003796479902 and covers the period April 1, 2000 to April 1, 2001. As addressed in TIG's previous correspondence of May 22, 2002, this policy covers certain third-party liabilities within the terms of the agreement.

*May 7, 2003*
3

As addressed in TIG's disclaimer letter of May 22, 2002, the CGL policy covers sums that the insured becomes legally obligated to pay for bodily injury, property damage, advertising injury or personal injury. TIG has denied coverage for the claims in his original complaint because those claims did not seek to recover covered damages.

In his Second Amended Complaint, however, Eudy has added claims for negligence, negligent retention, negligent infliction of emotional distress and tortious interference with contractual relations. Although Eudy does not seek compensation for his physical injuries, some of his amended claims could be based on emotional distress that he claims to have sustained as a result of his fall. By endorsement, "bodily injury" is defined as including emotional distress. Therefore, a possibility exists that Eudy's new claims may meet the bodily injury definition.

Notwithstanding this possibility, TIG questions whether there is coverage based on its independent assessment that Eudy was an employee of WCW, and not an independent contractor. Significantly, the policy excludes coverage for bodily injury to "an employee of the insured arising out of and in the course of: (a) Employment by the insured; or (b) Performing duties related to the conduct of the insured's business." Similarly, the policy contains an Employment-Related Practices Exclusion that excludes coverage by an individual "arising out of any: (a) Refusal to employ that person; (b) Termination of that person's employment; or (c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person." This language may prevent coverage from being afforded for the claims asserted by Eudy.

Likewise, coverage may not exist under the policy for the claims asserted against Mr. Laurinaitis. Although WCW's employees are insured "for acts within the scope of their employment by [WCW] or while performing duties related to the conduct of [WCW's] business," they are expressly outside the definition of an insured for injuries to a "co-employee." TIG's independent investigation reveals that Mr. Laurinaitis is a WCW employee; consequently, he may not meet the definition of an insured for purposes of Eudy's claims under the policy.

## CONCLUSION

Based on the foregoing analysis, TIG seriously questions whether coverage exists under the CGL policy for the claims asserted by Eudy. TIG is continuing its investigation of this matter, and reserves the right to deny coverage at any time. In addition to paying for the post-tender defense of the Second Amended Complaint, TIG may participate in settlement negotiations, contribute to a settlement, contribute to payment of a judgment, post an appeal bond or undertake other actions to bring the claim to a close, all subject to the express understanding that TIG reserves all of its rights to deny coverage as set forth herein. TIG's defense under a reservation of rights is expressly conditioned on its right to file a declaratory judgment to determine its coverage obligations, including but not limited to the question of Eudy's status as an employee of WCW

3

May 7, 2003
4

No action by TIG or any agent, lawyer or representative thereof in investigating, adjusting or compromising the claim should be considered as an estoppel or waiver of TIG's right to deny coverage. You have the right, at your own expense, to retain an attorney to defend this claim. Should you decide to do so, TIG will cooperate with any such counsel to the extent that it is reasonably possible. Also, if you have not already done so, all other insurers should be put on notice given the possibility of coverage not existing under TIG's policy, as well as the policy limits applicable to the claim.

If you believe that additional policies should apply or TIG has misinterpreted the material facts or relevant insurance policy provisions, please inform the undersigned immediately so the matter can be brought to a conclusion. Nothing stated herein relieves defendants of their responsibility to keep TIG informed of any additions or amendments to the claim consistent with the reporting requirements of the policy of insurance issued by TIG.

By mentioning certain provisions in this letter, TIG does not imply that no other policy provisions or laws may impact the coverage analysis in this case. TIG expressly reserves the right to rely upon any condition, provision or exclusion in the policy that may limit or preclude coverage, whether those terms are discussed in this letter or not.

TIG Insurance Company

Joan Morales

cc:     Bill O'Neill
        Lance Brenn
        Philip W. Savrin, Esq.

JAS7770
3999.39763

# United States District Court

NORTHERN _____ DISTRICT OF _____ GEORGIA
ATLANTA DIVISION

TIG INSURANCE COMPANY

**V.**

UNIVERSAL WRESTLING CORP., INC.
f/k/a WORLD CHAMPIONSHIP WRESTLING,
INC., TURNER SPORTS, INC., TURNER
ENTERTAINMENT GROUP, INC., SIDNEY
R. EUDY, and JOHNNY LAURINAITIS

## SUMMONS IN A CIVIL CASE

CASE NUMBER:

**1 03 CV 2096**

TO: (Name and address of defendant)

Johnny Laurinaitis
C/o James Lamberth, Esq.
Troutman Saunders, LLP
600 Peachtree Street, N.E, Suite 5200
Atlanta, GA 30308-2216

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Philip W. Savrin
Freeman Mathis & Gary, LLP
100 Galleria Parkway
Suite 1600
Atlanta, GA 30339-5948

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of
this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for
the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of
time after service.

LUTHER D. THOMAS

_____
CLERK

_____
(BY) DEPUTY CLERK

JUL 24 2003
_____
DATE

# United States District Court

NORTHERN _____ **DISTRICT OF** _____ GEORGIA
ATLANTA DIVISION

TIG INSURANCE COMPANY

**V.**

UNIVERSAL WRESTLING CORP., INC.
f/k/a WORLD CHAMPIONSHIP WRESTLING,
INC., TURNER SPORTS, INC., TURNER
ENTERTAINMENT GROUP, INC., SIDNEY
R. EUDY, and JOHNNY LAURINAITIS

## SUMMONS IN A CIVIL CASE

CASE NUMBER:

**1** 03 CV 2096

TO: (Name and address of defendant)

Sidney R. Eudy
215 River Trace
Marion, AR 72364

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Philip W. Savrin
Freeman Mathis & Gary, LLP
100 Galleria Parkway
Suite 1600
Atlanta, GA 30339-5948

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of
this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for
the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of
time after service.

LUTHER D. THOMAS

CLERK

JUL 24 2003

DATE

(BY) DEPUTY CLERK

# United States District Court

NORTHERN ———————— DISTRICT OF ———— GEORGIA

ATLANTA DIVISION

TIG INSURANCE COMPANY

**V.**

UNIVERSAL WRESTLING CORP., INC.
f/k/a WORLD CHAMPIONSHIP WRESTLING,
INC., TURNER SPORTS, INC., TURNER
ENTERTAINMENT GROUP, INC., SIDNEY
R. EUDY, and JOHNNY LAURINAITIS

## SUMMONS IN A CIVIL CASE

CASE NUMBER **1 03 CV 2096**

TO: (Name and address of defendant)

Universal Wrestling Corporation, Inc.
f/k/a World Championship Wrestling, Inc.
c/o CT Corporation System, Registered Agent
1201 Peachtree Street, N.E.
Atlanta, GA 30361

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Philip W. Savrin
Freeman Mathis & Gary, LLP
100 Galleria Parkway
Suite 1600
Atlanta, GA 30339-5948

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

LUTHER D. THOMAS

CLERK

(BY) DEPUTY CLERK

DATE

# United States District Court

ORIGINAL

NORTHERN _____ DISTRICT OF _____ GEORGIA

ATLANTA DIVISION

TIG INSURANCE COMPANY

**V.**

UNIVERSAL WRESTLING CORP., INC.
f/k/a WORLD CHAMPIONSHIP WRESTLING,
INC., TURNER SPORTS, INC., TURNER
ENTERTAINMENT GROUP, INC., SIDNEY
R. EUDY, and JOHNNY LAURINAITIS

## SUMMONS IN A CIVIL CASE

CASE NUMBER:

**1 03 CV 2096**

TO: (Name and address of defendant)

Turner Entertainment Group, Inc.
c/o CT CORPORATION SYSTEM, Registered Agent
1201 Peachtree Street, N.E.
Atlanta, GA 30361

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Philip W. Savrin
Freeman Mathis & Gary, LLP
100 Galleria Parkway
Suite 1600
Atlanta, GA 30339-5948

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of
this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for
the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of
time after service.

LUTHER D. THOMAS

CLERK

JUL 21 2003

DATE

(BY) DEPUTY CLERK

# United States District Court

ORIGINAL

NORTHERN _____ DISTRICT OF _____ GEORGIA
ATLANTA DIVISION

TIG INSURANCE COMPANY

V.

UNIVERSAL WRESTLING CORP., INC.
f/k/a WORLD CHAMPIONSHIP WRESTLING,
INC., TURNER SPORTS, INC., TURNER
ENTERTAINMENT GROUP, INC., SIDNEY
R. EUDY, and JOHNNY LAURINAITIS

## SUMMONS IN A CIVIL CASE

CASE NUMBER:

**1 03 CV 2096**

TO: (Name and address of defendant)

Turner Sports, Inc.
c/o CT CORPORATION SYSTEM, Registered Agent
1201 Peachtree Street, N.E.
Atlanta, GA 30361

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Philip W. Savrin
Freeman Mathis & Gary, LLP
100 Galleria Parkway
Suite 1600
Atlanta, GA 30339-5948

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

LUTHER D. THOMAS

CLERK

(BY) DEPUTY CLERK

JUL 24 2003

DATE